# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 02-3692

_____

| | | |
|---|---|---|
| Vilma Menendez-Donis, | * | |
| | * | |
| Petitioner, | * | |
| | * | |
| v. | * | Petition for Review of a |
| | * | Decision of the Board of |
| John Ashcroft, Attorney General | * | Immigration Appeals. |
| of the United States, | * | |
| | * | |
| Respondent. | * | |

_____

Submitted:  December 19, 2003

Filed:  February 19, 2004

_____

Before MORRIS SHEPPARD ARNOLD, LAY, and RILEY, Circuit Judges.

_____

MORRIS SHEPPARD ARNOLD, Circuit Judge.

Vilma Menendez-Donis petitions for review of an order of the Board of Immigration Appeals (BIA) affirming an immigration judge's (IJ's) denial of asylum. We affirm the BIA's decision.

I.

Ms. Menendez-Donis is a native of Guatemala. She fled to the United States after being beaten and gang raped in her home, entering the country without

inspection. She conceded that she was deportable but sought asylum on the ground of political persecution. *See* 8 U.S.C. §§ 1101(a)(42)(A), 1158.

Four years before Ms. Menendez-Donis was attacked, her husband, a cattle farmer, was approached by rebel guerillas and asked for financial support. He refused and was later found shot to death. Ms. Menendez-Donis believes that the guerrillas killed him because they suspected him of being a government sympathizer. Later, her husband's uncle was found shot, and in the period before her rape her neighbors repeatedly suggested to Ms. Menendez-Donis that she was in danger from rebels. After Ms. Menendez-Donis fled to the United States, her nineteen-year-old son was found beaten to death near her former home in Guatemala. Ms. Menendez-Donis maintains that her rapists were guerillas who attacked her because they believed that she was a government sympathizer.

Persons seeking political asylum must show that they have a well-founded fear of being persecuted on the basis of political beliefs or imputed political beliefs if they return to their country. *See Behzadpour v. United States*, 946 F.2d 1351, 1352-53 (8th Cir. 1991); *see also* 8 U.S.C. § 1101(a)(42)(A). Asylum-seekers who demonstrate past political persecution presumptively have a well-founded fear of future persecution, and the burden shifts to the government to show that such a fear is objectively unreasonable. *See Cigaran v. Heston*, 159 F.3d 355, 357 (8th Cir. 1998).

The IJ concluded that Ms. Menendez-Donis failed to show that the attack on her was motivated by her actual or imputed political beliefs. Ms. Menendez-Donis could not see her attackers, who were masked. They did not identify themselves; indeed, they did not say anything to Ms. Menendez-Donis other than to threaten to kill her. She testified that she may have recognized the voice of one of the attackers as being that of a family acquaintance associated with the guerillas, but she could not positively identify him. The IJ also discounted the reports that Ms. Menendez-Donis

heard from neighbors before she was raped as simple rumors. Given the four-year time lapse between her husband's death and the attack on her, as well as the lack of certainty as to the identity of the rapists, the IJ found that the attack on Ms. Menendez-Donis was an instance of ordinary crime not political persecution.

The IJ went on to find that there was no basis for a reasonable belief that Ms. Menendez-Donis would be persecuted were she to return to Guatemala. There was no direct evidence that the rebels were responsible for the death of Ms. Menendez-Donis's husband. Even if he was killed in retaliation by the guerrillas, the IJ found that the civil war in Guatemala was over and that there was no evidence that the rebels were engaged in retaliation against former opponents. He based his findings on reports by the State Department and human rights organizations describing the current situation in Guatemala. Pursuant to 8 C.F.R. § 3.1(a)(7) (2003) (now codified at 8 C.F.R. 1003.1(a)(7), *see* 68 Fed. Reg. 9824, 9830 (Feb. 28, 2003)), the BIA adopted the IJ's opinion as its final decision.

## II.

Before the passage of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, the applicable statute required courts reviewing BIA decisions to uphold factual determinations that were "supported by reasonable, substantial, and probative evidence on the record considered as a whole." 8 U.S.C. § 1105a(a)(4) (1994). The currently applicable section states that on review "administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B). Despite the fact that the current language appears to be narrower than the previous language, we have declined to treat the 1996 amendment as working any material change to the standard of review. *See Navarijo-Barrios v. Ashcroft*, 322 F.3d 561, 562 (8th Cir. 2003). As other circuits have noted, Congress seems to have drawn the language for the new statute directly from *INS v. Elias-Zacarias*, 502 U.S. 478, 481 & n.1, 483-84 (1992), a decision construing the former statute. *See, e.g., Sevoian v. Ashcroft*,

290 F.3d 166, 171 (3d Cir. 2002). We thus apply the so-called substantial evidence standard outlined in the *Elias-Zacarias* opinion. *Cf. Tang v. INS*, 223 F.3d 713, 718 (8th Cir. 2000).

The substantial evidence standard was originally imported into administrative law from cases dealing with the review of jury verdicts. *See* 2 Kenneth Culp Davis & Richard J. Pierce, Jr., *Administrative Law Treatise* 174-75 (3d ed. 1994) (citing *ICC v. Louisville & Nashville, R.R. Co.*, 227 U.S. 88, 94 (1912)); *see also* Robert L. Stern, *Review of Findings of Administrators, Judges and Juries: A Comparative Analysis*, 58 Harv. L. Rev. 70, 74-75 (1944). Hence, it has always involved a large amount of deference to the relevant fact-finder. For example, it is a more deferential standard than the "clearly erroneous" standard that we use for reviewing factual determinations by lower court judges. *See, e.g., United States v. Abad*, 350 F.3d 793, 797 (8th Cir. 2003). Under that standard, we can overturn factual findings that we conclude are clearly wrong even though they are not unreasonable. In contrast, under the substantial evidence standard we cannot substitute our determination for that of the administrative fact-finder just because we believe that the fact-finder is clearly wrong. *Cf. Feleke v. INS*, 118 F.3d 594, 598 (8th Cir. 1997); *see also* 2 Davis & Pierce, *supra*, at 174. Rather, before we can reverse we must find that it would not be possible for any reasonable fact-finder to come to the conclusion reached by the administrator. *See Elias-Zacarias*, 502 U.S. at 481 & n.1, 483-84.

In 1951, the Supreme Court clarified the substantial evidence standard for reviewing the decision of an administrative agency by holding that it required a review of the record as a whole. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487-88 (1951). When reviewing a jury verdict, a court ignores all evidence contrary to the verdict and then draws every reasonable inference in favor of the verdict from the remaining evidence. In the administrative setting, however, *Universal Camera* states that "the substantiality of the evidence must take into account whatever in the record fairly detracts from its weight." *Id.* at 488. Thus, while we do not review the

record to come to our own conclusions that we then measure against an administrative fact-finder's determinations (as in the review of judicial fact-finding) we are required to consider all of the evidence when drawing our conclusions about the reasonableness of an administrator's findings of fact.

In order to overturn the administrative findings, therefore, we must conclude not only that a persuasive case has been made for the opposite position, but that any reasonable fact-finder would be persuaded by it. *See Elias-Zacarias*, 502 U.S. at 481 & n.1, 483-84. The standard thus focuses on the hypothetical fact-finder who would refuse to be persuaded by the argument against the factual findings: If such a hypothetical fact-finder could do so reasonably, then the findings must be upheld. The hypothetical fact-finder's obstinacy must be grounded in a proper amount of evidence: "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *see Shipley v. Arkansas Blue Cross and Blue Shield*, 333 F.3d 898, 901 (8th Cir. 2003). Substantial evidence, however, does not mean a preponderance of the evidence. *Leonard v. Southwestern Bell Corp. Disability Income Plan*, 341 F.3d 696, 701 (8th Cir. 2003).

In other words, a reviewing court must uphold factual findings if three conditions exist. First, the factual findings must be supported by some substantial level of evidence, which need not rise to the level of a preponderance. Second, the evidence must be substantial when the entire record is examined: Contrary evidence may not simply be ignored on review. Finally, the evidence must be such that it would be possible for a reasonable fact-finder to reach the same conclusions that the administrative fact-finder did. If any of these conditions is not met, the administrative decision must be reversed.

III.

Applying this standard to Ms. Mendez-Donis's case we feel obliged to uphold the IJ's decision. Given the inconsistency in Ms. Menendez-Donis's testimony and information from the State Department and elsewhere, there was more than a scintilla of evidence supporting the IJ's conclusion that she did not have a well-founded fear of future persecution. Furthermore, the IJ's findings are consistent with the cumulative weight of the gaps in Ms. Menendez-Donis's testimony, namely, the unknown circumstances of her son's death, and the lack of clear evidence as to the identity of her attackers or the motives for their attacks. Substantial evidence on the record as a whole thus supports the IJ's conclusion. Perhaps a reasonable fact-finder could have found in Ms. Menendez-Donis's favor, but that is not the question here. Applying the appropriate standard, we cannot say that every reasonable fact-finder would come to a conclusion different from the one that the IJ reached.

Since we must uphold the IJ's determination that Ms. Menendez-Donis was not subject to previous political persecution, we also must reject her claim that she is entitled to humanitarian asylum. Even if asylum-seekers lack a well-founded fear of future persecution, they can still be eligible for so-called "humanitarian asylum" if the past persecution was especially atrocious. *Franscois v. INS*, 283 F.3d 926, 930-31 (8th Cir. 2002). While we do not doubt that Ms. Menendez-Donis was the victim of a brutal crime, we are required to affirm the IJ's finding that it was not an act of political persecution.

IV.

We affirm the BIA's decision for the reasons indicated.

-6-

LAY, Circuit Judge, dissenting.

Unlike the majority, I feel no obligation to uphold the agency's decision, which essentially provides that politically motivated death threats to the Petitioner and her family, followed by the consequent murder of three of the Petitioner's family members and Petitioner's own brutal gang rape, is not "persecution" within the meaning of the Immigration and Nationality Act. *See* 8 U.S.C. § 1101(a)(42)(A). Because I believe that Ms. Menendez-Donis's testimony compels the conclusion that she suffered past persecution on the basis of her imputed political beliefs, I respectfully dissent.

At her hearing, Menendez-Donis described a pattern of violence resulting from her and her family's refusal to succumb to guerilla demands.[1] Menendez-Donis's husband, Abel Rame Escobar-Solares, and her husband's uncle, Fernando Vasquez Escobar, were partners in a cattle business in a small town outside Chiquimulilla, Guatemala. Sometime before 1992, Solares and Escobar were approached by members of Fuerzas Armadas Rebeldes ("FAR"), a Guatemalan guerilla group, and asked to participate in, and financially support, the organization. Solares, Escobar, and their families (collectively "the family") refused to support the FAR guerillas. The FAR guerillas interpreted this refusal as evidence that they supported the Guatemalan government. Thereafter, FAR repeatedly threatened to kill the men if they would not support FAR. The men did not give in to the guerillas' demands.

On December 10, 1992, Menendez-Donis's husband, Solares, was murdered while he lay sleeping in his hammock outside his home. For two years after Solares' death, Escobar and the family continued to receive repeated threats from FAR to the

---

[1]Menendez-Donis was found credible by the IJ, and her testimony must therefore be accepted as undisputed fact. *See, e.g., Yazitchian v. INS*, 207 F.3d 1164, 1168 (9th Cir. 2000).

effect that they would be killed if they did not support the guerillas. Escobar did not give in to FAR's demands. In October of 1994, Escobar was murdered.

About three months after the death of her husband, Menendez-Donis personally received a note, signed by FAR, threatening to kill her if she refused to give the guerillas financial support. After the death of Escobar, she inherited the cattle farm and was therefore a primary target for the FAR guerillas, who wanted money. Over the next few years Menendez-Donis continued to receive threats from FAR, communicated to her through others in the community, that she and her family would be killed if she refused to give FAR support. Menendez-Donis did not give in to the guerillas' demands.

Consequently, on April 20, 1997, Menendez-Donis was beaten and serially raped by three individuals who came into her home, vowing to kill her. Because the attackers were wearing masks, Menendez-Donis could not visually identify them, but she thought she recognized the voice of one of her attackers as an individual that her husband had previously warned her was a FAR guerilla.

Menendez-Donis survived the attack, and with the help of her brother she fled to Guatemala City where she received medical treatment. Believing she would be killed by FAR if she remained in Guatemala, she sought asylum in the United States. Even while in this country, the threats and violence against her family by FAR guerillas have continued. A year after she fled Guatemala, her children received another written death threat. Her son was later beaten to death.

I do not believe this evidence supports the IJ's conclusion that her rape was an "incident of common crime." To the contrary, I believe that any reasonable fact-finder would agree that the attack on Menendez-Donis was consistent with the pattern of violence against her and her family for failing to comply with the demands of FAR guerillas, who viewed them as government loyalists.

The BIA has previously cautioned against holding petitioners to an impossible standard of proof:

> Persecutors may have differing motives for engaging in acts of persecution, some tied to reasons protected under the Act and others not. Proving the actual, exact reason for persecution or feared persecution may be impossible in many cases. An asylum applicant is not obliged to show conclusively why persecution has occurred or may occur.
>
> . . . Rather, an asylum applicant bears the burden of establishing facts on which a reasonable person would fear that the danger arises on account of his . . . political opinion.

*In re S-P*, 21 I & N Dec. 486, 489-90 (1996) (quotations and citations omitted). While Menendez-Donis may not have been able to conclusively prove that she was raped as retaliation for failing to comply with the guerillas' demands, I believe this is the only inference a reasonable fact-finder could draw from her testimony.

Once this political motive is established, there are no other obstacles to Menendez-Donis's asylum eligibility. If politically motivated, there is no question that the threats and violence described above constitute past persecution. *See Del Carmen Molina v. INS*, 170 F.3d 1247, 1249 (9th Cir. 1999) (holding that "Molina's actual, uncontradicted, and credible testimony [of the murder of her cousin and subsequent threats of violence against her family] evidence[d] past persecution"); *Garrovillas v. INS*, 156 F.3d 1010, 1016 (9th Cir. 1998) (holding that the receipt of three death threat notes in three months as a result of the petitioner's affiliation with a political group constituted past persecution); *Sangha v. INS*, 103 F.3d 1482, 1487 (9th Cir.1997) (finding past persecution where a terrorist group wanted to recruit petitioner and threatened him with death); *Lopez-Galarza v. INS*, 99 F.3d 954, 959 (9th Cir. 1996) (holding that rape on account of an imputed political opinion constitutes past persecution).

Furthermore, I have no hesitation in concluding that this past persecution was sufficiently severe and atrocious to qualify Menendez-Donis for humanitarian asylum, *see Francois v. INS*, 283 F.3d 926, 931 (8th Cir. 2002), which is available regardless of the likelihood of future persecution. *See Belayneh v. INS*, 213 F.3d 488, 491 (9th Cir. 2000) ("[R]ape may constitute an atrocious form of persecution."); *see also Lal v. INS*, 255 F.3d 998, 1008 (9th Cir. 2001) (same); *Lopez-Galarza*, 99 F.3d at 962-63 (same).

For these reasons, I believe the BIA's decision is not supported by substantial evidence and Menendez-Donis should be found eligible for asylum.

_____