# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 02-4062

_____

| | | |
|---|---|---|
| Olakitan Eusebio, | * | |
| | * | |
| Petitioner, | * | |
| | * | |
| v. | * | Petition for Review of a |
| | * | Decision of the Board of |
| John Ashcroft, Attorney General | * | Immigration Appeals. |
| of the United States, | * | |
| | * | |
| Respondent. | * | |

_____

Submitted: December 19, 2003

Filed: March 25, 2004

_____

Before MORRIS SHEPPARD ARNOLD, LAY and RILEY, Circuit Judges.

_____

MORRIS SHEPPARD ARNOLD, Circuit Judge.

Olakitan Eusebio petitions for review of an order of the Board of Immigration Appeals (BIA) upholding an immigration judge's denial of Mr. Eusebio's application for asylum. We affirm.

Mr. Eusebio is from Togo, where he worked as a high school science teacher. He was involved in various political activities critical of the regime of Gnassingbe Eyadema, who came to power in Togo after a military coup in 1967. Mr. Eusebio distributed leaflets and attended rallies. At two demonstrations, Mr. Eusebio was

beaten by police when they dispersed the protesters. While breaking up another demonstration, the police chased Mr. Eusebio and some friends into a nearby house, where Mr. Eusebio and his friends locked themselves in a room while the police beat on the door for several minutes before leaving. Mr. Eusebio was returning from another anti-Eyadema political event held in the neighboring country of Benin, when he was detained by the military because he was wearing a T-shirt emblazoned with the face of Sylvanus Olympio, the leader whom Mr. Eyadema overthrew. Mr. Eusebio was released shortly thereafter when a family friend intervened on his behalf. In 1993, Mr. Eusebio and his family fled to Benin during the unrest that accompanied a failed coup by some military officers against Mr. Eyadema. When Mr. Eusebio returned, his home had been damaged and looted by the military. Some time later, after Mr. Eusebio gave a failing grade to Mr. Eyadema's son in one of his classes, the school principal changed Mr. Eusebio's class schedule, and six weeks after the incident Mr. Eyadema's son's bodyguard threatened Mr. Eusebio that he "would regret" his decision to give the grade. Soon thereafter, the police arrested Mr. Eusebio and held him for forty-eight hours for anti-Eyadema statements in school. After being released, Mr. Eusebio received a subpoena to appear before a magistrate, whereupon he left Togo for the United States on a previously obtained student visa, entering our country in July, 1996. Mr. Eusebio's visa has expired, and he concedes that he is deportable. In November of 1997, he filed an application for political asylum.

In order to prevail, political asylum seekers must show that they have a well-founded fear of future persecution on the basis of their political beliefs. *See* 8 U.S.C. §§ 1101(a)(42)(A),1158(b)(1). If they can show that they suffered past political persecution, then a rebuttable presumption arises that they will suffer future persecution. *See Cigaran v. Heston*, 159 F.3d 355, 357 (8th Cir. 1998). The Ninth Circuit has properly observed that "persecution is an extreme concept." *Fisher v. INS*, 79 F.3d 955, 961 (9th Cir. 1996) (en banc). Low-level intimidation and

-2-

harassment does not rise to the level of persecution. *See Fisher v. INS*, 291 F.3d 491, 497-98 (8th Cir. 2002).

The IJ found that Mr. Eusebio did not have a well-founded fear of future political persecution. She first concluded that Mr. Eusebio had failed to show that he had been subject to past political persecution, because being chased or beaten by authorities while participating in rallies did not constitute persecution as a matter of law. Even Mr. Eusebio's detention by the police, the IJ held, was not prolonged or serious enough to "rise to the level of past persecution on account of [political beliefs]." As for his confrontation with the son of Mr. Eyadema and his body guard, the IJ found that the harassment was based on personal animosity rather than political beliefs.

The IJ pointed out that despite his long-time membership in the opposition party, Mr. Eusebio had no difficulty in obtaining a visa to leave the country. She also took note of a United States Department of State report indicating that during the previous year there had been no reported political disappearances in Togo; that the political party to which Mr. Eusebio belongs exists publically in Togo and garnered thirty percent of the vote in the last election; that additional opposition parties exist; and that while some leading activists have been jailed, many have not been, and opposition rallies are well attended and generally do not meet with official opposition from the government. The IJ concluded that, while political conditions in Togo may not be ideal, Mr. Eusebio, as a rank-and-file member of an opposition party, was not likely to suffer future political persecution. The BIA adopted the IJ's opinion.

We review the BIA's legal determinations *de novo*. *Ikenokwalu-White v. INS*, 316 F.3d 798, 804 (8th Cir. 2003), giving due deference to the administrative agency's interpretation of the statute, *see United States v. Mead*, 533 U.S. 218, 227, 228 (2001). It is a well-established principle that minor beatings and brief detentions, even detentions lasting two or three days, do not amount to political persecution, even

if government officials are motivated by political animus. *See, e.g., Nelson v. INS*, 232 F.3d 258, 264 (1st Cir. 2000), *Prasad v. INS*, 47 F.3d 336, 339 (9th Cir. 1995), *Kapcia v. INS*, 944 F.2d 702, 704-05, 708 (10th Cir. 1991). We cannot say that the abuse Mr. Eusebio suffered was more severe than that suffered by those whose claims the courts have routinely rejected. We thus affirm the BIA's legal holding that the minor beatings and detentions to which Mr. Eusebio was subjected did not rise to the level of political persecution.

Mr. Eusebio's claim that his house was destroyed in retaliation for his political beliefs is a good deal more serious. The IJ found, however, that the destruction of the house was incidental to general unrest accompanying a failed military conspiracy and not on account of Mr. Eusebio's political beliefs. After reviewing the record, we conclude that this factual determination survives review under the "substantial evidence" standard.

The substantial evidence standard that we employ when reviewing BIA factual determinations is extremely deferential. *See Menendez-Donis v. Ashcroft*, No. 02-3692, 2004 WL 307451 (8th Cir. Feb. 19, 2004). As opposed to our review of judicial fact-finding, we are not at liberty to reverse even a decision that we find to be clearly erroneous. *Id.*, slip op. at 4. Rather, we must affirm the BIA's factual decisions unless, after having reviewed the record as a whole, we determine that it would not be possible for a reasonable fact-finder to adopt the BIA's position. *Id.*, slip op. at 4-5. The requirement that we look at "the record as a whole" means that unlike what we do when we review jury verdicts, we may not simply disregard evidence contrary to the decision. *See id.*

Mr. Eusebio testified that the destruction of his house occurred in March, 1993. According to Mr. Eusebio, however, from February, 1993, to July, 1993, he and his family were living in Benin because there was "total insecurity" in Togo. He also testified that at this time the military was going through the streets "shooting at

-4-

anything that moved" and that houses in addition to his own were destroyed during the unrest. Given this testimony, we cannot say that any reasonable fact-finder would be compelled to conclude that the IJ's findings were erroneous.

Because Mr. Eusebio did not demonstrate past political persecution, he would be entitled to asylum only if he carried the burden of showing that he had a well-founded fear of future persecution. *See Cigaran*, 159 F.3d at 357. The political situation in Togo, it is true, is hardly optimal. For instance, the State Department report on which the BIA relied indicates that while there were no disappearances or extrajudicial killings in the previous year in Togo, such disappearances and killings have in fact occurred there in the past. On the other hand, the same report indicates that many citizens of Togo engage in opposition politics without suffering persecution. Indeed, Mr. Eusebio's own testimony corroborates this view of the situation in Togo: According to that testimony, despite years of political activism he never seems to have been deliberately targeted by authorities, although he has been beaten and briefly detained while participating in mass rallies. The single exception involved what the IJ reasonably characterized as a personal dispute between Mr. Eusebio and the bodyguard of Mr. Eyadema's son. We therefore conclude that substantial evidence in the record as a whole supports the IJ's rejection of Mr. Eusebio's claim for asylum because of a well-founded fear of future persecution.

We therefore affirm the BIA's decision.

LAY, Circuit Judge, dissenting.

I respectfully dissent.

While I acknowledge that our standard of review places an onerous burden on an asylum applicant seeking reversal of an agency decision, I disagree with the majority's conclusion that Eusebio has failed to overcome that burden. I believe that

the record plainly demonstrates that Eusebio has a well-founded fear of future persecution based on his political beliefs, and that no reasonable fact-finder could find to the contrary. *See Kratchmarov v. Heston*, 172 F.3d 551, 554 (8th Cir. 1999). By denying asylum on this record, the INS sends a young man back to Togo to face certain persecution and torture.

In determining that substantial evidence supports the IJ's decision, the majority overlooks significant instances of persecution that occurred immediately before, and that were the motivating factors in, Eusebio's decision to depart for the United States. These repeated instances of persecution were the subject of detailed testimony by Eusebio, and the IJ did not doubt his credibility as to any of the underlying facts. The INS also overlooks that the State Department report concerning Togo shows a great deal of unrest and persecution based upon political belief.

Both the IJ and the majority completely minimize the events surrounding Eusebio's act of giving Eyadema's son a failing grade in physics and chemistry, dismissing them as the result of a personal dispute between Eusebio and the son's bodyguard. Closer analysis of the record reveals that the facts cannot reasonably bear such a construction, and that the dispute was motivated by political, not personal, differences. After Eusebio issued the bad grade, Eyadema was upset with his son's failure and contacted the headmaster of the school, seeking to have it changed. When Eusebio refused to do so and further refused to act as the son's tutor, the headmaster immediately switched Eusebio's teaching assignments. Eusebio encountered the son's bodyguard approximately six weeks later, whereupon the bodyguard informed Eusebio that he would regret his insolence.

One week after Eusebio's encounter with the bodyguard, police arrested Eusebio at his home and took him to the stationhouse, where he was subjected to interrogation accompanied by physical abuse. During this interrogation, Eusebio's accusers expressly referred to his act of giving Eyadema's son a failing grade,

-6-

viewing the incident as part of a larger scheme on the part of Eusebio in opposition to the Eyadema regime. It was only after his mother and several friends intervened that Eusebio was released, but not before he was warned to cease his opposition politics or face certain death. A few days later, the government issued a subpoena to Eusebio to appear "for the purposes of an investigation." Fearing that the retribution he had momentarily escaped was about to come to fruition, Eusebio used his student visa to flee to the United States.

Against the combined weight of the foregoing evidence, the majority asserts that "the IJ reasonably characterized [the incident] as a personal dispute between Mr. Eusebio and the bodyguard of Mr. Eyadema's son." *Ante*, at 5. The only apparent support for this conclusion is the majority's reference to the "extremely deferential" standard of review applicable to cases such as that now presented on appeal. To be sure, the decisions of the immigration courts are to be treated with considerable respect, rendered as they are by a tribunal with specialized expertise and experience. Yet this deference is not without limits; factual determinations must be supported by substantial evidence, not mere supposition. As a panel of this court noted only a short time ago, "[s]ubstantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Menendez-Donis v. Ashcroft*, No. 02-3692, 2004 WL 307451 (8th Cir. Feb. 19, 2004), slip op. at 5 (citation and quotation omitted).

What then, is the substantial evidence to support the IJ's conclusion that the confrontation between Eyadema's bodyguard and Eusebio was not politically motivated? The IJ relies upon an exhibit showing that Eyadema's son dropped out of school before receiving his degree, inferring that the son had received bad grades in the past and that Eusebio's grade assignment was unlikely to arouse the ire of Eyadema. The IJ also relies heavily on the fact that the confrontation did not occur until six weeks after Eusebio refused to change the son's grade, and that the bodyguard was not even sure that Eusebio was the teacher responsible. How these

facts can rationally be tied together to reach the conclusion that Eusebio's subsequent arrest, interrogation, physical abuse, and subpoena for investigation by the Eyadema regime was due to a personal grudge by a bodyguard escapes me.

Instead, I would hold that Eusebio met his burden of establishing eligibility for asylum by demonstrating that he harbored a well-founded fear of persecution on account of his political opinion. *See* 8 U.S.C. §§ 1101(a)(42)(A), 1158(b). The IJ's conclusion that Eusebio's fear is not objectively reasonable because he is merely a "rank-and-file member" of an opposition party completely ignores the fact that Eusebio had previously been singled out by Eyadema for investigation and abuse. The same holds true for the IJ's reliance on the fact that much of Eusebio's family continue to live in Togo unharmed. Accordingly, I would remand the case to the Board of Immigration Appeals with instructions to grant Eusebio's petition.

———————————————