**Ronald J. BALLARD, Plaintiff,**

v.

**Jo Anne B. BARNHART,
Commissioner of Social
Security, Defendant.**

No.  4:04–CV–90056.

United States District Court,
S.D. Iowa,
Central Division.

July 2, 2004.

Mark T. Hedberg, Hedberg Owens Hedberg & Walsh PC, Des Moines, IA, for Plaintiff.

Christopher D. Hagen, United States Attorney, Des Moines, IA, for Defendant.

## ORDER

PRATT, District Judge.

■ Plaintiff, Ronald J. Ballard, filed a Complaint in this Court on January 27, 2004, seeking review of the Commissioner's decision to deny his claim for Social Security benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.* This Court may review a final decision by the Commissioner. 42 U.S.C. § 405(g). For the reasons set out herein, the decision of the Commissioner is reversed and remanded for further proceedings.

## BACKGROUND

Plaintiff filed an application for Social Security Disability benefits on April 30, 2002. Tr. at 41–43. Plaintiff claimed to have become disabled May 31, 2001. Tr. at 41. Plaintiff is insured for Title II benefits through December, 2006. Tr. at 46. After the application was denied, initially and on reconsideration, Plaintiff requested a hearing before an Administrative Law Judge. The hearing was held June 25, 2003, before Administrative Law Judge Jean M. Ingrassia (ALJ). Tr. at 281–320. The ALJ issued a Notice Of Decision—Unfavorable on November 12, 2003. Tr. at 11–20. After the decision was affirmed by the Appeals Council on January 21, 2004, (Tr. at 6–9), Plaintiff filed a Complaint in this Court on January 27, 2004.

## MEDICAL AND VOCATIONAL HISTORY

Plaintiff was seen by Rodney E. Johnson, M.D. on September 20, 1999, after he had fallen from a ladder while doing some painting at his home. Tenderness was localized to the radial head of the right elbow. He was to keep his arm in a sling and remain off work for two weeks. On

October 11, 1999, the fracture was healing and Plaintiff was told he could resume activity as tolerated. Tr. at 229.

On May 22, 2001, Plaintiff was admitted to Mercy Hospital Medical Center in Des Moines, Iowa after having felt weak and fatigued. Tests in the emergency room showed a hemoglobin of 14. Tr. at 114. That same day, Plaintiff underwent surgery the name of which was "Esophago-gastroduodenoscopy with biopsy and sclerotherapy and BICAP cautery of duodenal ulcer." Tr. at 117.

On June 1, 2001, Plaintiff was in an automobile accident. The vehicle which he was driving rolled over. X-rays did not show any fractures in his spine, although some mild degenerative joint disease was noted at C5–C6 (Tr. at 129). The diagnosis was status post motor vehicle accident with lumbar sprain. Plaintiff was told to stay off work for one week. Tr. at 127.

Plaintiff was admitted to Mercy Hospital on August 3, 2001, after feeling as though his entire body leaned to the left. The diagnosis was questionable transient ischemic attack. Tr. at 135.

A letter dated August 22, 2001, to Cass Franklin, M.D. from physical therapist Kathleen Graham, states that Plaintiff had undergone 21 physical therapy sessions since June 25, 2001. Ms. Graham recommended that Plaintiff continue with physical therapy for work conditioning. It was noted that Plaintiff was scheduled for work conditioning at Des Moines Sports Medicine. Tr. at 140. A summary of pertinent findings, dated December 18, 2001, from Des Moines Sports Medicine and Physical Therapy Center states that Plaintiff was continuing physical therapy at that clinic. Tr. at 151.

On December 4, 2001, Plaintiff was seen by M.S. Iqbal, M.D. on referral from Kurt Smith, D.O. for a lumbar epidural steroid injection. Tr. at 176.

On January 4, 2002, physical therapist Bob Augustine, wrote to Dr. Smith regarding a functional capacity evaluation. Tr. at 179–80. The significant findings were: 1. No radiculopathy found with testing nor neurological deficits; 2. Limited lumbar segmental mobility; and 3. Reproducible tenderness at the spinous processes L3–L5. Tr. at 180. During the evaluation, Plaintiff demonstrated high abilities in lifting from his waist to overhead and horizontal carry. He demonstrated significant limitations in repetitive squatting and lifting from the floor to his waist. He also was limited in his ability to crouch, bend in a sitting and standing posture, and in seated trunk rotation. Tr. at 182.

Carma A. Mitchell, M.S., vocational rehabilitation Consultant, wrote a report dated May 8, 2002. Tr. at 103–05. Ms. Mitchell wrote that in addition to interviewing Plaintiff about his functional restrictions, she had access to the reports of the functional capacity evaluation at Des Moines Sports Medicine, and the restrictions given by Dr. Smith. Tr. at 104. Ms. Mitchell wrote:

> Taking into consideration Mr. Ballard's age, education, work history and functional limitations outlined in the file information, he has lost access to at least 80% of the jobs he had access to prior to his work related injury. The remaining jobs he would have access to are entry level in nature ... Mr Ballard will need selective job placement to find a position within these functional abilities.

Tr. at 105. Ms. Mitchell concluded her report by stating that Plaintiff's subjective complaints of needing to continually alternate positions, lay down during the day, and needing to lean forward while working at a desk, would remove him from the ability to maintain competitive employment. Tr. at 105.

On June 20, 2002, Plaintiff was seen for a physical examination by Majed Barazanji, M.D. Tr. at 195–97. Plaintiff told the doctor that he had constant pain in his back. He said the pain radiates to his thoracic and cervical spine but not to his lower extremities. Plaintiff denied any numbness or tingling. He said that the pain was constant and that it was usually a dull ache, but that it became sharp at times. Plaintiff said that bending, squatting and lifting, make the pain worse. The doctor wrote that x-rays and an MRI showed a bulging disc at L4–L5, and L4–S1 (sic). On physical examination, Plaintiff was 68 1/2 inches tall and weighed 243 pounds. He appeared healthy and in no acute distress. Tr. at 195. On orthopedic examination, there was tenderness to palpation of the lumbar spine. Plaintiff was able to squat and walk on his toes and heals. No muscle weakness was detected and Plaintiff's gait was normal. Tr. at 196. Dr. Barazanji opined that Plaintiff could lift 10 to 15 pounds. He said that Plaintiff would have problems stooping, climbing, kneeling and crawling. The doctor said that Plaintiff could tolerate standing for two hours. He said that Plaintiff could walk or move about without problems. He said that Plaintiff could tolerate sitting for one or two hours at a time in a soft chair. Tr. at 197.

Plaintiff saw Dr. Smith, on March 19, 2003, for evaluation of chronic neck pain of increasing intensity. Plaintiff said that it was becoming difficult to drive because he couldn't turn and look over his shoulder. Pain radiated to his shoulders, but he denied numbness or tingling in his arms or hands. On physical examination, there was palpable tenderness in the cervical paraspinal musculature at the C5–6 level. There was a significantly decreased range of motion of the cervical spine in all planes of movement. X-rays showed severe degenerative disc changes at the C5–6 level. Tr. at 230. Dr. Smith ordered an MRI to evaluate the extent of disc degeneration. On the night of March 30, 2003, Plaintiff phoned after hours to report that he had been in an accident and that his right leg was numb. Donna J. Bahls, M.D., who took the call, told Plaintiff that while his numbness might be indicative of a disc problem which should be evaluated, it was not an emergency situation. Dr. Bahls suggested that Plaintiff go to an emergency room and said she would report to Dr. Smith the next morning. On April 15, 2003, Dr. Smith noted that Plaintiff had not gone to an emergency room. Dr. Smith reviewed the results of an MRI. In addition to the aforementioned degeneration changes, there was a disc bulging and spur formation resulting in mild neuroforaminal stenosis on the left at C6–7. There was no evidence of high grade nerve root impingement of the lumbar spine. There was mild degenerative disc disease, disc bulging at L4–5 and L5–S1. "No evidence of critical stenosis or nerve root impingement [was] identified." Plaintiff was scheduled for injection to his neck and low back. Tr. at 232.

Plaintiff was seen for an independent medical examination by Jerome G. Bashara, M.D. on May 5, 2003. Tr. at 261–64. The doctor wrote that Plaintiff's symptoms were progressive stiffness in his neck and intermittent pain in his neck over the last several-month period. Dr. Bashara diagnosed musculoligamentous strain of the cervical spine and degenerative disc disease of the cervical spine. Tr. at 263. The doctor wrote that Plaintiff's permanent restrictions were no repetitive activities involving the head and neck. Tr. at 264.

As a part of a worker's compensation proceeding, Dr. Smith was deposed on May 9, 2003. Tr. at 233–55. Dr. Smith testified that he first saw Plaintiff November 14, 2001, after the motor vehicle acci-

dent. At that time, Plaintiff complained of low back, mid thoracic and cervical pain. Tr. at 237. Dr. Smith ordered an MRI which showed mild degenerative disc and facet disease at L4–5 and L5–S1. He said there was no evidence of focal nerve root irritation or compression. The doctor ordered an epidural injection and physical therapy. Tr. at 238. The doctor said Plaintiff reached maximum medical improvement on or about January 9, 2002. In March 2003, Plaintiff was seen for complaints of neck pain. Tr. at 239. An MRI of April 15, 2003, demonstrated severe degenerative disease of C5–6, moderate disc changes at C3–4, and to a lesser extent at C4–5. Disc bulging was noted at C6–7 with mild neuro-foraminal stenosis. Plaintiff underwent an epidural injection in his cervical spine. Tr. at 240. The doctor said that Plaintiff is limited to lifting no more than 10 pounds from the knee level, and no bending, stooping, twisting activities. Tr. at 241. With regard to the cervical spine, the doctor testified that Plaintiff should avoid repetitive turning of the head or hyperextension of the neck and holding in one position for extended periods of time. Tr. at 243.

On April 16, 2003, Plaintiff underwent a stress echocardiogram in an examination for evidence of inducible myocardial ischemia. Tr. at 273. Plaintiff underwent coronary angiography, left heart catheterization and left ventriculography on April 28, 2003. Tr. at 271. Under the heading "conclusions," normal coronary arteries, and normal left ventricular function were noted. Plaintiff was advised to stop smoking. Tr at 272. One week later, on May 7, 2003, Plaintiff was noted to have a large pseudoaneurysm which originated from the common femoral artery. Tr. at 270. Laurie Kuetstner, M.D. recommended that Plaintiff proceed to Mercy Medical Center for an ultrasound guided Thrombin injection. Dr. Kuetstner noted that Plaintiff continued to smoke. Tr. at 269. On May 13, 2003, Dr. Kuetstner wrote a report to Douglas A. Layton, D.O. Dr. Kuetstner wrote that Plaintiff continued to smoke a pack of cigarettes a day. She also wrote that Plaintiff had reported to the hospital for the thrombin injection it was observed that the cavity had spontaneously thrombosed making the procedure unnecessary. Tr. at 266.

## ADMINISTRATIVE HEARING

Plaintiff appeared and testified at a hearing before the ALJ on June 25, 2003. Tr. at 281–320. Plaintiff, whose birth date is January 20, 1947, was 56 years old at the time of the hearing. Tr. at 285. Plaintiff testified that he had graduated from high school (Tr. at 286), and completed a five year apprenticeship with the electricians union. He said that he had worked as an electrician for 35 years. Tr. at 287. Plaintiff said that his duties included troubleshooting commercial and industrial buildings, as well as pulling wire through conduit pipes. Tr. at 288. Plaintiff said that he stopped working because of the injuries sustained in the automobile accident on June 1, 2001. Plaintiff said that he tried to do some office work for his employer but that it made his back so sore that he was not able to continue. Tr. 298.

Plaintiff said that he can walk about a half mile at a time. He said he can stand a half hour at a time. He said that bending and stooping causes his back to hurt worse. He said that he is unable to rotate his head without getting headaches, and as a result, he does not drive much. Tr. at 293. Plaintiff testified that his lifting limit is 10 pounds. He said that he can sit a half hour in a comfortable chair. Tr. at 294. He said that pushing and pulling puts a strain on his back. Plaintiff said that he did not have problems remembering or concentrating unless he's in a lot of pain. Tr. at 295.

Plaintiff said that before he got hurt, he enjoyed playing golf and going bowling but that he was no longer able to do those activities. He said that household chores such as vacuuming or washing dishes, makes his back hurt. He also said that his sons do his lawn work for him. Tr. at 299.

Plaintiff testified that when he was taking Hydrocodone, he had a reaction that was like a heart attack. He said that after the angiogram, he quit taking the Hydrocodone. He said that he was not taking any pain medication.

The ALJ directed the vocational expert to listen to her and the claimant discuss the restrictions given by the physicians. Tr. at 304. The ALJ quoted Dr. Smith as saying that Plaintiff was to lift from the knee level to waist, 10 pounds on a constant level, 20 pounds frequently. From waist to over head, Plaintiff could lift 15 pounds constantly and 35 pounds occasionally. The ALJ noted the difficulty with forward bending from the standing or sitting positions. Tr. at 304. The ALJ also noted Plaintiff's need to avoid repetitive turning of the head or hyperextension of the neck or holding it in one place for extended periods. Tr. at 306. The ALJ noted the need to avoid repetitive bending, stooping or twisting. Tr. at 308. Given those restrictions, the vocational expert testified that Plaintiff would not be able to do his past relevant work. Tr. at 309. The vocational expert testified that Plaintiff's would be able to transfer his skills to jobs such as building inspectors of various sorts. Tr. at 310–11. The vocational expert testified that an individual who could not drive would not be able to do the jobs he cited. Tr. at 316.

## ADMINISTRATIVE DECISION

In the decision dated November 12, 2003, following the sequential evaluation set out in the regulations, the ALJ found that Plaintiff had not engaged in substantial gainful activity at any time after the alleged onset of disability, May 21, 2001. At the second step, the ALJ found Plaintiff's severe impairments were, "severe degenerative disc disease in the cervical spine and bulging discs in the low back with low back pain." At the third step, the ALJ found that Plaintiff's severe impairments were not of a severity to meet any listed in Appendix I, Subpart P, Regulations No. 4. Tr. at 26. The ALJ found that Plaintiff has the residual functional capacity to lift up to 10 pounds constantly and 20 pounds frequently. He can lift up to 15 pounds frequently and 35 pounds occasionally from waist level to a point over his head. The ALJ found that Plaintiff is not capable of lifting objects from below the level of his knees. The ALJ found that he has difficulty sustaining stability when bending forward, whether sitting or standing. At the Fourth step, the ALJ found that Plaintiff was not able to do his past relevant work as an electrician. Tr. at 19. At the fifth step, the ALJ found that Plaintiff has skills which will transfer to the jobs cited by the vocational expert. It was the ALJ's decision, therefore, that Plaintiff is not disabled nor entitled to the benefits for which he applied. Tr. at 20.

## DISCUSSION

The scope of this Court's review is whether the decision of the Secretary in denying disability benefits is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g). *See Lorenzen v. Chater*, 71 F.3d 316, 318 (8th Cir.1995). Substantial evidence is less than a preponderance, but enough so that a reasonable mind might accept it as adequate to support the conclusion. *Pickney v. Chater*, 96 F.3d 294, 296 (8th Cir.1996). We must consider both evidence that supports the Secretary's decision and that which detracts from it, but the denial of benefits shall not be over-

turned merely because substantial evidence exists in the record to support a contrary decision. *Johnson v. Chater,* 87 F.3d 1015, 1017 (8th Cir.1996) (citations omitted). When evaluating contradictory evidence, if two inconsistent positions are possible and one represents the Secretary's findings, this Court must affirm. *Orrick v. Sullivan,* 966 F.2d 368, 371 (8th Cir.1992) (citation omitted). *Fenton v. Apfel,* 149 F.3d 907, 910–11 (8th Cir.1998).

■ In *Barnett v. Barnhart,* 362 F.3d 1020, 1022 (8th Cir.2004), the Court, citing *Menendez–Donis, v. Ashcroft,* 360 F.3d 915, 918. (8th Cir.2004), wrote, "Before we can reverse we must find that it would not be possible for any reasonable fact-finder to come to the conclusion reached by the [ALJ]." In *Menendez–Donis,* Judge Morris Sheppard Arnold explained that the substantial evidence standard was originally imported into administrative law from cases dealing with the review of jury verdicts. *Review of administrative decisions "has always involved a large amount of deference to the relevant fact-finder."* The Court continued: "[U]nder the substantial evidence standard we cannot substitute our determination for that of the administrative fact-finder just because we believe that the fact-finder is clearly wrong. Rather, before we can reverse we must find that it would not be possible for any reasonable fact-finder to come to the conclusion reached by the administrator." Citations omitted. Nevertheless, the opinion continues, *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 487–88, 71 S.Ct. 456, 95 L.Ed. 456 (1951), holds that the substantiality of the evidence must take into account whatever in the record fairly detracts from its weight. As Judge Lay wrote in *Gavin v. Heckler,* 811 F.2d 1195, 1199 (8th Cir.1987), the substantial evidence on the record as a whole test requires a "scrutinizing analysis," and a "searching inquiry." In *Stark v. Wein-*

*berger,* 497 F.2d 1092, 1099 n. 14 (7th Cir.1974) Circuit Judge, now Mr. Justice, Stevens wrote:

We must of course, affirm the Secretary's decision if it is supported by substantial evidence. 42 U.S.C. § 405(g); *Bartell v. Cohen,* 445 F.2d 80, 82 (7th Cir.1971). However, this does not mean that the findings of the administrative agency must be blindly accepted. On the contrary, the statutorily-granted right of review contemplates more than an uncritical rubber stamping of the administrative action. *Byrd v. Richardson,* 362 F.Supp. 957, 959 (D.S.C.1973).

Furthermore, as Judge Bright wrote in *Brueggemann v. Barnhart,* 348 F.3d 689, 692 (8th Cir.2003), "We do not defer to the ALJ's legal conclusions." The most concise statement of this standard was stated in *Brinker v. Weinberger,* 522 F.2d 13, 16 (8th Cir.1975) when Judge Stephenson wrote: "In making this inquiry, we should neither consider a claim de novo, nor abdicate our function to carefully analyze the entire record in conducting a review."

■ The Court of Appeals has often stated: "There is no doubt the claimant is experiencing pain; the real issue is how severe that pain is." *E.g. Gowell v. Apfel,* 242 F.3d 793, 796 (8th Cir.2001) and cases cited therein. This is not a case where no one believes the claimant experiences pain. The ALJ found that Plaintiff was sincere, but that he was incorrect in his conclusions regarding his limitations. Tr. at 19. The Court agrees with that reasoning, and finds the residual functional capacity found by the ALJ is supported by substantial medical evidence. In *Lewis v. Heckler,* 808 F.2d 1293, 1297, (8th Cir.1987), the Court held, as is held in the case sub judice, that the residual functional capacity finding was supported by substantial medical evidence. The Court went on: "However, there is a second element to the

Secretary's burden which we believe the Secretary failed to meet. In addition to establishing that Lewis was capable of performing some other type of work, the Secretary must also show that jobs exist in the national economy that realistically suit the claimant." In *Hensley v. Barnhart*, 334 F.3d 768, 769 (8th Cir.2003), the Court wrote that at step five of the sequential evaluation, "the claim must be considered in light of several vocational factors (age, education, and work experience) and the individual's residual functional capacity." The Court went on to write that it is as a result of this two pronged inquiry by which a determination of Plaintiff's status as disabled or not disabled is determined. Included in the two pronged test is the necessity to prove that the claimant's residual functional capacity allows the ability to perform a significant number of other jobs in the national economy. *Holley v. Massanari*, 253 F.3d 1088, 1093 (8th Cir. 2001).

In *Howard v. Massanari*, 255 F.3d 577, 581–82, (8th Cir.2001), the Court wrote that testimony from a vocational expert constitutes substantial evidence, when it is "based on a properly-phrased hypothetical" question which sets forth all of the claimant's impairments. *See also, Baugus v. Secretary of Health & Human Services*, 717 F.2d 443, 446–47 (8th Cir.1983) in which the court wrote: "A vocational expert cannot be expected to assume the evidence and testimony and then state an opinion as to whether a claimant has residual skills that can be transferred to other occupations ... The ALJ must enumerate the claimant's impairments and must include ... allegations of pain and other nonexertional impairments."

■ In the case at bar, rather than addressing the vocational expert with a hypothetical question which took into account the claimant's impairments and limitations, the ALJ engaged in a dialogue with Plaintiff regarding limitations which had been noted by the treating physicians. The vocational expert was expected to sort out which of the limitations to consider and which to ignore. Although the vocational expert asked for some clarification, the Court cannot say that his testimony is substantial evidence to support the denial of benefits. At the risk of elevating form over substance, therefore, the Court finds that a remand in necessary.

In addition, there is a second problem. The vocational expert testified that Plaintiff's work as an electrician provides him with skills which can be transferred to other work which can be done within the restrictions of the ALJ's "hypothetical." Particularly in light of the report prepared by vocational expert Carma Mitchell, this testimony begs scrutiny.

The vocational expert provided Dictionary of Occupational Titles (DOT) codes for each of the jobs under discussion here. Plaintiff's past relevant work was as an electrician—DOT code 824.261–010. The DOT describes this job thus:

Plans layout, installs, and repairs wiring, electrical fixtures, apparatus, and control equipment: Plans new or modified installations to minimize waste of materials, provide access for future maintenance, and avoid unsightly, hazardous, and unreliable wiring, consistent with specifications and local electrical codes. Prepares sketches showing location of wiring and equipment, or follows diagrams or blueprints, ensuring that concealed wiring is installed before completion of future walls, ceilings, and flooring. Measures, cuts, bends, threads, assembles, and installs electrical conduit, using tools such as hacksaw, pipe threader, and conduit bender. Pulls wiring through conduit, assisted by electrician helper 829.684–022. Splices wires by stripping insulation

from terminal leads, using knife or pliers, twisting or soldering wires together, and applying tape or terminal caps. Connects wiring to lighting fixtures and power equipment, using handtools. Installs control and distribution apparatus, such as switches, relays, and circuit-breaker panels, fastening in place with screws or bolts, using handtools and power tools. Connects power cables to equipment, such as electric range or motor, and installs grounding leads. Tests continuity of circuit to insure electrical compatibility and safety of components, using testing instruments, such as ohmmeter, battery and buzzer, and osciloscope. Observes functioning of installed equipment or system to detect hazards and need for adjustments, relocation, or replacement. May repair faulty equipment or systems [electrician, maintenance (any industry) 829.261–018]. May be required to hold license. May cut and weld steel structural members, using flame-cutting and welding equipment. May be designated according to work location as Mine Electrician (mine & quarry).

This job involves medium exertional work, and specific vocational preparation (SVP) level 7—Over 2 years up to and including 4 years. The first job to which the vocational expert testified Plaintiff could transfer his skills was that of a building inspector, DOT code 168.167–030. A person holding this job:

Inspects new and existing buildings and structures to enforce conformance to building, grading, and zoning laws and approved plans, specifications, and standards: Inspects residential, commercial, industrial, and other buildings during and after construction to ensure that components, such as footings, floor framing, completed framing, chimneys, and stairways meet provision of building, grading, zoning, and safety laws and approved plans, specifications, and standards. Observes conditions and issues notices for corrections to persons responsible for conformance. Obtains evidence and prepares report concerning violations which have not been corrected. Interprets legal requirements and recommends compliance procedures to contractors, craft workers, and owners. Keeps inspection records and prepares reports for use by administrative or judicial authorities. May conduct surveys of existing buildings to determine lack of prescribed maintenance, housing violations, or hazardous conditions. May review request for and issue building permits. May specialize in inspecting multifamily residences, temporary structures, building to be moved, or building appendages, such as chimneys, signs, swimming pools, residences for enforcement of full range of building, zoning, grading, and mechanical codes, including electrical, plumbing, heating and refrigeration, ventilating, and air-conditioning regulations and be designated Residential Building Inspector (government ser.).

This is a light job with an SVP of 7—over 2 years up to and including 4 years.

The other job to which the vocational expert testified Plaintiff has transferable skills is insurance inspector, DOT code 168.267–010:

Inspects buildings to determine fire insurance rates: Examines building for type of construction, condition of roof, and fireproofing. Determines risk represented by adjoining buildings, by nature of business, and building contents. Determines availability of fireplugs and firefighting equipment. Completes inspection report. May compute insurance rate.

This is a light job with an SVP of 7, over 2 years up to and including 4 years.

Social Security Ruling (SSR) 82–41, under the heading "Application of the concept of transferability," points out that generally, the greater degree of skill a person has acquired in his or her past work, the less difficulty that person will have transferring the skill in other less demanding work. Among the important factors which must be considered in determining transferability of skills are reduced residual functional capacity and advancing age. It must be kept in mind that through most of the relevant period of time in this case, Plaintiff has been a person of advanced age. Although Plaintiff's lifting, standing and walking capabilities may be within the light work range, his inability to lift from below the knees and difficulty sustaining stability when bending forward, should be carefully considered by the vocational expert. Likewise, Plaintiff's advanced age should be taken into account.

■ In *Rhines v. Harris,* 634 F.2d 1076, 1078–79 (8th Cir.1980), the Court made it very clear that after a claimant has established that he or she can not do past relevant work, the burden is on the Secretary, now Commissioner, to establish that other work exists which can be performed in spite of the physical and mental restrictions. "Proof must be based on a realistic evaluation of claimant's abilities in view of her age, education, training, work experience, and physical and mental capabilities. ... Adequate proof cannot be based merely on the theoretical ability of claimant to perform some kind of work." (Citations omitted).

In light of the report of Carma Mitchell which at a minimum detracts from the substantiality of the evidence of this case, and given the fact that the vocational expert's testimony was not based on a properly phrased hypothetical question, it is the opinion of this Court that a remand for further proceedings is the appropriate remedy.

## CONCLUSION AND DECISION

It is the holding of this Court that Commissioner's decision is not supported by substantial evidence on the record as a whole. This case, therefore, is hereby remanded for further administrative proceedings and a new decision consistent with this opinion.

The judgment to be entered will trigger the running of the time in which to file an application for attorney's fees under 28 U.S.C. § 2412(d)(1)(B) (Equal Access to Justice Act). *See also, McDannel v. Apfel,* 78 F.Supp.2d 944 (S.D.Iowa 1999) (discussing, among other things, the relationship between the EAJA and fees under 42 U.S.C. § 406 B), and LR 54.2(b) [1].

IT IS SO ORDERED.

---

1. N.B. Counsel is reminded that LR 54.2(b), states that an EAJA application "must specifically identify the positions taken by the government in the case that the applicant alleges were not substantially justified."