# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-2287

_____

| | |
|---|---|
| Jacob Eta-Ndu; Catherine Eta-Ndu; Danielle Eta-Ndu; and Gwladys Eta-Ndu, | * |
| | * |
| | * |
| Petitioners, | * |
| | * |
| | * Petition for Review of an |
| v. | * Order of the Board of |
| | * Immigration Appeals. |
| Alberto Gonzales, Attorney General of the United States of America, | * |
| | * |
| | * |
| Respondent. | * |

_____

Submitted: October 18, 2004
Filed: June 23, 2005

_____

Before COLLOTON, LAY, and BENTON, Circuit Judges.

_____

BENTON, Circuit Judge.

Jacob Eta-Ndu, Catherine Eta-Ndu and two of their children[1] – Cameroon natives – challenge a final order of the Board of Immigration Appeals ("BIA") affirming a departure order issued by the immigration court. Jurisdiction is proper under 8 U.S.C. § 1105a(a) (1994), because the proceedings commenced before April 1, 1997, with the BIA decision issued after October 30, 1996. *See* **Pub. L. No. 104-**

_____

[1] The Eta-Ndus also have two other children who were born in the United States.

**208**, **110 Stat. 3009** (Sept. 30, 1996), repealing **8 U.S.C. § 1105a** (1994).  The BIA is affirmed.

## I.       Facts

Jacob Eta-Ndu entered the United States with a non-immigrant student visa on September 8, 1991, to attend the University of Minnesota.  His wife Catherine and children followed on a derivative visa.  On August 1, 1995, deportation proceedings commenced with an Order to Show Cause.  The Order alleged Jacob Eta-Ndu violated his non-immigrant status by failing to attend the University after September 1994, making the family deportable.  The Eta-Ndus admitted the factual allegations, including deportability, but renewed a previous application for asylum or withholding of deportation.[2]

Etu-Ndu claims he, his father, and his uncle were members of the Socialist Democratic Front ("SDF"), an opposition party to the ruling party, the Cameroon Peoples' Democratic Movement.  Eta-Ndu asserts that his family is a "social group" within the meaning of asylum laws, and he has a "political opinion" imputed from family associations.  Thus, he argues his own political opinion and membership in a particular social group (an SDF-supportive family) subjected him to past persecution, and makes him a target for future persecution.

At the first formal deportation hearing, Eta-Ndu testified that between 1990 and 1991, while living in Cameroon, he participated in mobilizing people and other grassroots work for the SDF.  During this time, his home was subjected to midnight

---

[2]Jacob Eta-Ndu's wife, Catherine, and their two Cameroon-born children are derivative beneficiaries of his request for the asylum and withholding of deportation. *See* **8 U.S.C. § 1158(c)** (1994).  Jacob Eta-Ndu, as the primary applicant for asylum, is hereinafter referred to as "Eta-Ndu."

searches by Cameroon authorities – allegedly looking for SDF documents – and he was detained for over three hours of questioning, after being shoved to the ground and kicked by Cameroon officials.

Eta-Ndu also testified that, in 1994, his uncle was murdered because of his SDF affiliation; shortly after the murder his father received death threats; his father's business mysteriously burned down; and, ultimately, his father and two brothers fled to Nigeria.

Catherine Eta-Ndu testified that the government ended her husband's student-salary, without explanation, and refused to reinstate it, after her request. She suspected it was due to her husband's SDF affiliation. She admitted that her mother and father, and a number of siblings – although not directly involved in any political matters – live peaceably in Cameroon. Both Jacob and Catherine also testified to having no trouble renewing their passports.

Dr. Milton Henry Krieger, an expert on Cameroon politics, also testified at the first deportation hearing. He described the SDF as the most effective opposition group in Cameroon, and noted shootings, arrests, and other adverse action by the government against SDF members. According to Dr. Krieger, SDF activists are well known throughout the county, and a murder of a known activist "would be exactly the sort of thing that the independent press, The Herald in particular reporting from Manfe would pick up . . . ." Dr. Krieger further explained that the SDF is a recognized, established political party with "fairly substantial" membership records, which would be able to verify membership of Eta-Ndu, his father, and uncle. He did note, however, membership may not be available from some remote areas, although he could not speak for Mr. Eta-Ndu's home base, Mamfe.

Dr. Krieger noted that Mamfe is a particularly dangerous area for the SDF, although he admitted that a mere card-carrying SDF member is probably safe in

Cameroon today. He further testified that while he has no personal knowledge, the uncle's death occurred in an area where such episodes infrequently come to light and could likely be due to SDF affiliation.

At the close of the testimony, the immigration judge ("IJ") requested confirmation from the SDF of Eta-Ndu's SDF-related activities, documentation of the uncle's death, and the burning of his father's business. In response, Eta-Ndu submitted two letters to the IJ, both typed, allegedly from SDF officials—one letter from Professor Tonyi Mbu-Agbor, of Mamfe, dated March 7, 1998; and a second letter from Dr. Ndi Christopher, of Bambili, dated March 4, 1998. Eta-Ndu also submitted letters from his father, brothers, and cousin (also a Cameroon magistrate) supporting his allegations; a police report about his uncle's murder; and a letter from the local Cameroon police officer who sent the report to Eta Ndu.

When the hearing reconvened, over two months later, the IJ admitted the letters and the police report into evidence. The letter from the father living in Nigeria first raised suspicion, because it was mailed from New York City, New York. The IJ also noticed that the letters from the SDF were typed on plain paper, without official letterhead—unlike letters confirming SDF membership for this IJ in other cases. The IJ further noted that the SDF letters were apparently typed on the same typewriter, mailed from the same place (Yaounde) on the same day. The IJ requested forensic analysis of the SDF letters, which concluded they came from the same typewriter.

Eta-Ndu offered several explanations. As to his father's letter, he testified that his father found a person in Nigeria who was traveling to the United States to mail the letter, because mail is so slow in Nigeria. Eta-Ndu submitted a letter from his father confirming this fact. As to the SDF letters, Eta-Ndu testified he had no knowledge of how the letters were prepared. Eta-Ndu did submit a letter from Dr. Christopher, explaining that he had no access to a typewriter in his office, requiring that all letters be typed by the secretary at the SDF's provincial office in Bamenda. Dr. Christopher

-4-

speculated that the second letter from Professor Mbu-Agbor was sent to the same place for typing, since he also likely lacked access to a typewriter. Finally, Etu-Ndu explained that the same postmarks were likely due to the fact that residents in Bamenda and Mamfe often mail letters close to an international airport, like Yaounde, because mail is also slow in their hometowns. Dr. Krieger, in an affidavit, stated he had heard about haphazard mail service and inaccurate postmarking in Cameroon, but had "no personal experience to confirm this."

## II.     Agency Decisions

Reviewing the evidence, the IJ concluded that Eta-Ndu did not present sufficient proof of past persecution. As for future persecution, the IJ found implausible Eta-Ndu's explanations about the SDF letters. The IJ also expressed concerns with the evidence of the uncle's murder, in light of Dr. Krieger's testimony that it would be "exactly" the sort of thing the independent press would pick up. Although the IJ did not make a specific adverse credibility finding, he found Eta-Ndu's credibility "seriously shaken" and concluded that because Etu-Ndu did not present objective, corroborating evidence he failed his burden of proof.

On appeal, the BIA affirmed the IJ's ruling that Eta-Ndu's experiences in Cameroon do not rise to a level of past persecution. The BIA then affirmed the IJ as to future persecution, focusing on the two disputed letters:

> The forensic analysis reveals that two letters were typed on the same typewriter, although allegedly sent by two different branches of the SDF located in different provinces of Cameroon. [Eta-Ndu] submitted a letter from the author of one of the letters stating that his office sends letters to a typing school to be typed. The Immigration Judge found that the explanation was unconvincing. We are not persuaded that the Immigration Judge's conclusion is unreasonable. [Eta-Ndu] did not

supply a statement from the author of the other letter, or from anyone in the location where that letter originated, to confirm that the other branch also uses the same typing school. In addition, we note that [Eta-Ndu] has not supplied a statement from the typing school to confirm that the school receives correspondence from both branches, types the correspondence, and returns the documents to the branches for a signature.

The BIA also declined to review additional evidence submitted by Eta-Ndu after the IJ's decision.

## III.    Asylum and Withholding of Deportation

Eta-Ndu contends that the BIA erred as a matter of law in affirming the IJ's decision that Eta-Ndu failed to establish a "well-founded fear of persecution" on account of his political opinion or social group membership. "Because the BIA essentially adopted the IJ's opinion while adding some of its own reasoning, we review both decisions." *Krasnopivtsev v. Ashcroft*, 382 F.3d 832, 837 (8th Cir. 2004), *citing Siong v. INS*, 376 F.3d 1030, 1036 (9th Cir. 2004); *Chand v. INS,* 222 F.3d 1066, 1072 n.7 (9th Cir. 2000).

Both the IJ and the BIA denied asylum and withholding of deportation, finding Eta-Ndu did not meet his burden of proof. This denial must be upheld if "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *INS v. Elias-Zacarias,* 502 U.S. 478, 481 (1992), *quoting* **8 U.S.C. § 1105a(a)(4) (1994)**. "[This] standard is a deferential one, requiring a reviewing court to uphold a denial of asylum unless an alien demonstrates 'that the evidence he presented was so compelling that no reasonable fact finder could fail to find the requisite fear of persecution.'" *Nyama v. Ashcroft*, 357 F.3d 812, 816 (8th Cir. 2004), *quoting Elias-Zacarias,* 502 U.S. at 483-84. Credibility determinations are

upheld if supported by specific, cogent reasons for disbelief. *Perinpanathan v. INS*, 310 F.3d 594, 597 (8th Cir. 2002) (quotation omitted).

However, this court is "not at liberty to reweigh the evidence." *Hasalla v. Ashcroft*, 367 F.3d 799, 803 (8th Cir. 2004), *citing Feleke v. INS*, 118 F.3d 594, 598 (8th Cir. 1997). Nor may this court "reverse even a decision that we find to be clearly erroneous. Rather, we must affirm the BIA's factual decisions unless, after having reviewed the record as a whole, we determine that it would not be possible for a reasonable fact-finder to adopt the BIA's position." *Eusebio v. Ashcroft*, 361 F.3d 1088, 1091 (8th Cir. 2004), *citing Menendez-Donis v. Ashcroft*, 360 F.3d 915, 918-19 (8th Cir. 2004) (citation omitted). *See Dia v. Ashcroft*, 353 F.3d 228, 249 (3rd Cir. 2003) (en banc) ("If a reasonable fact finder could make a particular finding on the administrative record, then the finding is supported by substantial evidence. Conversely, if no reasonable fact finder could make that finding on the administrative record, the finding is not supported by substantial evidence.").

The Attorney General may, in his discretion, grant asylum to a "refugee." **8 U.S.C. § 1158(b)(1)**. A refugee is "any person who is outside any country of such person's nationality . . . who is unable or unwilling to return . . . because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." **8 U.S.C. § 1101(a)(42)(A)**. "Persecution involves a threat to one's life or freedom on account of one of [these] five protected grounds." *Fisher v. INS*, 291 F.3d 491, 497 (8th Cir. 2002), *citing* **8 U.S.C. § 1101(a)(42)(A)**.

To establish a well-founded fear of persecution, the applicant must demonstrate the fear is both subjectively genuine and objectively reasonable. *Shoaira v. Ashcroft*, 377 F.3d 837, 844 (8th Cir. 2004). The subjective element may be proven by credible testimony that the applicant genuinely fears persecution. *Id.*, *citing Ghasemimehr v. INS*, 7 F.3d 1389, 1390 (8th Cir. 1993). The objective element requires "credible,

direct, and specific evidence that a reasonable person in the applicant's position would fear persecution if returned to [his] country of origin." *Id.*

Eta-Ndu asserts persecution claims based upon membership in a particular social group, the Eta-Ndu family. This requires a showing of a "pattern and practice" of persecution against his family on account of their social group status. *See* **8 C.F.R. § 208.13(b)(2)(iii)** (2004); ***Makonnen v. INS***, 44 F.3d 1378, 1383 (8th Cir. 1995) (defining a pattern and practice of discrimination as requiring "organized or systematic or pervasive persecution"). Even assuming that Eta-Ndu's allegations regarding his uncle and father were true, the evidence demonstrates they were persecuted due to their political beliefs, not their membership in the Eta-Ndu family. *See **Nyonzele v. INS***, 83 F.3d 975, 983 (8th Cir. 1996). Thus, the issue is whether Eta-Ndu has a well-founded fear of persecution based upon his own political beliefs.

### A.    Past Persecution

There is a rebuttable presumption of future persecution, once an applicant proves past persecution. *See* **8 C.F.R. § 208.13(b)(1)** (2004); ***Tawm v. Ashcroft***, 363 F.3d 740, 743 (8th Cir. 2004), *citing **Eusebio***, 361 F.3d at 1090. Although Eta-Ndu testified to an attack by Cameroon officials, and detention for nearly three hours, this does not constitute past "persecution" as a matter of law. *See **Tawm***, 363 F.3d at 743 ("Brief periods of detention do not necessarily constitute persecution."). This court has denied asylum despite evidence of even more serious abuse. *See **Id.***, *citing **Eusebio***, 361 F.3d at 1091 (brief detention and beating during political rallies and destruction of home insufficient to prove persecution), *and **Dandan v. Ashcroft***, 339 F.3d 567, 573-74 (7th Cir. 2003) (one-time, three-day imprisonment insufficient to prove persecution).

## B. Future Persecution

As set forth above, the applicant must establish a well-founded fear of persecution with "credible, direct, and specific evidence." *Shoaira*, 377 F.3d at 844. Evidence at the first hearing demonstrated that in Cameroon, the SDF is a prominent opposition party, whose members have a history of persecution. As to Eta-Ndu specifically, he testified that he, his father, and uncle actively participated in SDF activities, although neither he, his wife, or children were ever seriously harmed while living in Cameroon, nor did they have trouble obtaining travel documents. Further, although Eta-Ndu testified to his uncle's murder and the burning of his father's business, he admitted he did not know who was responsible for either incident.

Analyzing the evidence, the IJ divided Eta-Ndu's allegations into three categories: 1) active membership in the SDF, 2) his father's significant role as a local SDF leader, and 3) the politically-motivated murder of his uncle. The IJ required "objective evidence corroborating these three key factors in the case."

Eta-Ndu claims his testimony, standing alone, is credible and sufficient to meet his burden of proving persecution. He thus argues that the IJ and the BIA erred as a matter of law by requiring corroboration. To the contrary, the IJ and the BIA may require corroborative evidence "where it is reasonable to expect corroborat[ion]." *El-Sheikh v. Ashcroft*, 388 F.3d 643, 646 (8th Cir. 2004), *quoting Matter of S-M-J*, 21 I & N Dec. 722, 725 (BIA 1997) (en banc). However, a denial of asylum based upon

> the absence of corroborating evidence cannot be sustained if "the BIA [or the IJ] failed to: (1) rule explicitly on the credibility of [the applicant's] testimony; (2) explain why it was reasonable . . . to expect additional corroboration; or (3) assess the sufficiency of [the applicant's] explanations for the absence of corroborating evidence."

*Id.* at 647, *quoting **Diallo v. INS***, 232 F.3d 279, 287 (2nd Cir. 2000), *and rejecting **Ladha v. INS***, 215 F.3d 889, 899 (9th Cir. 2000) (the Ninth Circuit "does not require corroborative evidence from applicants . . . who have testified credibly").

1.

The IJ did not explicitly find the testimony of Eta-Ndu not credible.  This court does not require an explicit ruling on credibility before the IJ can expect additional corroboration. *See **El-Sheikh***, 388 F.3d at 647.  However, the IJ must, in such a case, explain why it is reasonable to expect additional corroboration. ***Id.***

2.

In this case, the IJ fully explained why it was reasonable to expect additional corroboration of Eta-Ndu's central claims. *See **El-Sheikh***, 388 F.3d at 646-47.  The IJ noted that according to Dr. Krieger, evidence of membership is easily available from the SDF.  Dr. Krieger also stated that a murder of an SDF activist would be reported in the local press in Cameroon.  Based upon this testimony, a request for documentary support of Eta-Ndu's SDF participation and the uncle's murder was not unreasonable. *See **id.*** at 646, *quoting **S-M-J***, 21 I &N Dec. at 724-26 ("An asylum applicant should provide documentary support for material facts which are central to his claim and easily subject to verification.").[3]

3.

The IJ then assessed Eta-Ndu's explanations of his attempted corroboration of alleged SDF activities. *See **El-Sheikh***, 388 F.3d at 647. Eta-Ndu submitted two

---

[3]Dr. Krieger did not provide corroboration of Eta-Ndu's specific claims. While Dr. Kreiger testified to the general cultural and political conditions in Cameroon in the 1990s, he stated that after obtaining information and learning details about acts of persecution of SDF members during his time in Cameroon, he was "not aware" of the death of Eta-Ndu's uncle, had "no knowledge" of the activities of Eta-Ndu's father, and was not "able to reach" Eta-Ndu's cousin/magistrate.

letters to corroborate his SDF participation. However, the IJ reasonably doubted their authenticity. Both letters lacked the "official" letterhead expected from an organized, established party like the SDF. More importantly, the forensic-documents analyst confirmed that the letters were typed on the same machine, despite having allegedly been sent from two separate officials, with offices located 40 miles apart.

The IJ determined that Eta-Ndu's explanations lacked "any sort of credible basis." Although one author explained that he sent his letters to a central typing school, Eta-Ndu failed to obtain a letter from the second author, or from the typing school, as the BIA noted. Eta-Ndu also failed to explain the practice of the school returning the documents back to the remote branches for the author's signature. This additional step would require another hand-carrying of the letters to and from two remote regions of Cameroon, with coincidental arrival back to the same postal office for postmark on the same day. The IJ concluded that without further corroboration from the SDF, the IJ could not overlook the questionable circumstances under which the two letters originated. *See **Diallo***, 232 F.3d at 289-90 (noting that "petitioners may meet their burden of proof by offering a *believable* and sufficient explanation as to why such corroborating evidence was not presented") (emphasis added).

In addition to the SDF letters, Eta-Ndu presented corroborating evidence in support of SDF involvement and his family's persecution: letters from his father, brothers, and cousin/magistrate supporting his allegations; a police report about his uncle's murder; and a letter from the local Cameroon police officer who sent the report to Eta-Ndu. The officer's letter referenced Eta-Ndu's father fleeing to Nigeria and his uncle's murder due to "dirty politics." The officer acknowledged, however, that his assistance was personally solicited by Eta-Ndu's cousin/ magistrate. Because this evidence essentially consisted of letters from family and close friends, the IJ found the evidence lacking "objectivity." Therefore, the only "objective" evidence before the IJ were the two letters.

The IJ and BIA explained that Eta-Ndu's implausible explanations for the suspicious letters coupled with a lack of "objective" corroboration undermined Eta-Ndu's case. *See Nyonzele*, 83 F.3d at 983. Although the IJ did not specifically find Eta-Ndu not credible, the IJ determined that the provided documents lacked credibility. The IJ and the BIA gave "specific, cogent reasons" for not accepting Eta-Ndu's explanations and finding the documents not credible. *Perinpanathan*, 310 F.3d at 597. Because this court must "give the immigration judge's credibility finding 'much weight,'" this determination is upheld. *Id.* at 598, *quoting Hajiani-Niroumand v. INS*, 26 F.3d 832, 838 (8th Cir. 1994). Based upon the unbelievable documents and attempted justifications, the IJ and the BIA found Eta-Ndu failed to meet his burden of proof.

The IJ and the BIA correctly addressed Eta-Ndu's corroboration and explanations, concluding he failed to meet his burden of proof. Based upon the record, denial of asylum to the Eta-Ndus is supported by "reasonable, substantial, and probative evidence." *Menendez-Donis*, 360 F.3d at 917-18. This court does not find the evidence so compelling that no reasonable factfinder could find as the BIA and IJ did. *See Elias-Zacarias*, 502 U.S. at 483-84.

## C.    Withholding of Deportation

Eta-Ndu also seeks withholding of deportation. The standard of proof for withholding of deportation is more stringent than asylum. *Krasnopivtsev*, 382 F.3d at 840, *citing* **8 U.S.C. § 1231(b)(3)**. "The alien must show a 'clear probability' that he or she will face persecution in the country to which he or she will be deported." *Id.*, *quoting Hasalla*, 367 F.3d at 803. Because Eta-Ndu failed to prove eligibility for asylum, he also fails the higher burden of proof required for withholding of deportation. *See id.*

-12-

## IV. Due Process

Eta-Ndu claims that the BIA violated his due process rights by not reopening and remanding his case for new evidence.[4] For an asylum applicant "to prevail on a due process challenge, [he] must show prejudice." *Shoaira*, 377 F.3d at 843. Prejudice is found "where defects in the deportation proceedings 'may well have resulted in a deportation that would not otherwise have occurred.'" *United States v. Torres-Sanchez*, 68 F.3d 227, 230 (8th Cir. 1995)(citation omitted). Therefore, this court first ascertains whether a "defect" occurred, and then determines whether the applicant adequately proves "prejudice."

The BIA's denial of a motion to reopen and remand is reviewed for abuse of discretion. *See INS v. Doherty*, 502 U.S. 314, 323-24 (1992); *Patel v. Ashcroft*, 375 F.3d 693, 695 n.2 (8th Cir. 2004), *citing Ramirez-Alejandre v. Ashcroft*, 319 F.3d 365, 382 (9th Cir. 2003) ("Under BIA procedure, a motion to remand must meet all the requirements of a motion to reopen and the two are treated the same."). This court affirms the BIA's denial of a motion to reopen "if the movants have failed to establish a prima facie case for the substantive relief they seek or if the movants have failed to introduce material evidence that was previously unavailable." *Strato v. Ashcroft*, 388 F.3d 651, 654 (8th Cir. 2004)*, citing INS v. Abudu,* 485 U.S. 94, 104-05 (1988).

The BIA denied Eta-Ndu's motion because he did not present "new evidence." Eta-Ndu failed to adequately explain why the proffered evidence was "unavailable at the time of the hearing before the IJ." *See* **8 C.F.R. § 1003.2(c)(1)**. He did not

---

[4]Eta-Ndu also claims that the IJ violated due process by prematurely closing the record on October 5, 1998, and by failing to adequately specify the type of corroborative evidence he required. Eta-Ndu failed to make this argument to the BIA. This court will not address the IJ's alleged due process violation because this court lacks jurisdiction to hear claims not raised before the BIA in the first instance. *See Gebremaria v. Ashcroft*, 378 F.3d 734, 736 n.4 (8th Cir. 2004).

show why such evidence was unavailable either in 1998 or before the close of evidence on November 7, 2000.

Eta-Ndu gave two explanations for failing to present the evidence earlier. First, he "believed" the record was closed on October 5, 1998—the deadline for documents confirming SDF activity and the uncle's murder. Nearly two years passed between the time Eta-Ndu "believed" the record was closed and the final deportation hearing. During this time, he made no attempt to submit further evidence, or request a reopening of the record. At the final hearing, Eta-Ndu's counsel – after the IJ said that the record was "to be closed" – stated that he had "no objection."

Alternatively, Eta-Ndu explained that only after the IJ issued the decision on November 7, 2000, did he know that the IJ required SDF documentation on "official" letterhead. Eta-Ndu, however, misinterprets the IJ's decision. The IJ noted the overall suspicious nature of the documents, which tainted his credibility, not just their failure to appear "official." The IJ adequately notified Eta-Ndu that he was to produce "documentation from the SDF in Cameroon confirming [his] activities." Eta-Ndu was even given time to explain the suspicious letters, yet failed to submit objective, reliable documentation of his SDF membership.

Neither explanation proves the evidence was "unavailable" to Eta-Ndu prior to the April 1998 or the November 2000 hearings, nor do the explanations prove prejudice to Eta-Ndu. He was given an adequate directive and sufficient time to present any objective, reliable evidence. He made no objection to the closing of the record at the final hearing. Accordingly, the BIA did not abuse its discretion by denying Eta-Ndu's motion to reopen and remand. Thus, Eta-Ndu does not prove a defect prejudicial enough to maintain a due process claim.

Accordingly, the decision of the BIA is affirmed.

LAY, Circuit Judge, dissenting.

I strongly disagree with the majority's decision to affirm the BIA's denial of Eta-Ndu's asylum application based on future persecution.[5]  This decision will ultimately result in Eta-Ndu's certain persecution and probable ensuing death in Cameroon.  The majority has not fulfilled its duty to consider fairly the record "as a whole" because it disregards critical and uncontroverted expert testimony proving that Eta-Ndu faces a serious possibility of persecution in Cameroon.  The majority also contradicts the governing record and misapplies the applicable legal standard by affirming the IJ's decision on the basis of speculation, not substantial evidence.

## I.    The "Substantial Evidence" Standard of Review

When the BIA denies asylum to an applicant under 8 U.S.C. § 1105a(a)(4) (1994), this court reviews the BIA's decision under the "substantial evidence" test. *See Lopez-Zeron v. United States Dep't of Justice*, 8 F.3d 636, 638 (8th Cir. 1993); *Behzadpour v. United States*, 946 F.2d 1351, 1353 (8th Cir. 1991).  Although this standard of review seems straightforward, it actually encompasses two tests.

We will *affirm* the BIA's denial of asylum if the BIA's decision was "supported by reasonable, substantial and probative evidence on the record considered *as a whole*." *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992) (emphasis added); *see also* 8 U.S.C. § 1105a(a)(4).  A denial of asylum cannot be based on speculation which is what occurred here.  In order to *reverse* the BIA's denial of asylum, however, an appellate court must be able to state that "the evidence presented by [the asylum applicant] was such that a reasonable factfinder would *have* to conclude that the

---

[5]I concur that Eta-Ndu's case is fundamentally premised upon political opinion (not social group), and in the denial of Eta-Ndu's past persecution and due process claims.

-15-

*requisite fear of persecution* existed." *Elias-Zacarias*, 502 U.S. at 481 (emphasis added).

The requisite fear of persecution for asylum, however, is just a "well-founded fear of persecution." Our precedents have defined a "well-founded fear of persecution" on account of political opinion as having a subjective and objective component: (1) a subjective fear of persecution and (2) a "***reasonable possibility***" of persecution. *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 440 (1987) (emphasis added); *see also Elias-Zacarias*, 502 U.S. at 481(citing *Cardoza-Fonseca* with approval); *Lopez-Zeron*, 8 F.3d at 638. Obviously, most asylum cases hinge on the objective component.

The majority does not fully set forth the sub-elements of the standard of review, *see supra* majority opinion at 6-7, but doing so is important in this case because the Government offers an erroneous interpretation of *Elias-Zacarias*: it claims that in order to overturn the BIA's denial of asylum, Eta-Ndu (i.e., the *asylum applicant*) must have presented "substantial evidence" below, and then the Government defines "substantial evidence" as:

> enough to justify, if the trial were to a jury, a *refusal to direct a verdict* when the conclusion sought to be drawn from it is one of fact for the jury. Thus, the *full* import of *Elias-Zacarias*' teaching is that a court can reverse a Board determination that asylum . . . was not established *only* if the applicant's evidence would have entitled him, were his eligibility a matter for a jury to decide, to a *directed verdict taking the issue away from the jury*.

Brief for Respondent at 30 (first and last emphasis added). This articulation of the rule is incorrect and confusing on several levels. It is not worthwhile to point out every error inherent in the Government's articulation, but two points warrant attention.

-16-

First, the applicant does not have to offer "substantial evidence" in support of his or her claim. The substantial evidence requirement in no way relates to the applicant's burden of proof; that standard only applies to the BIA's decision. Second, the applicant does not have to prove that he or she faces a *probability* of persecution, which is what the Government's proposed standard requires (i.e., it effectively requires the panel to be certain that the applicant will be persecuted). Probabilities relate to the *likelihood* that an event will occur, but the fact that an asylum applicant's

> fear must be "well-founded" does not alter the obvious focus on the individual's subjective beliefs, nor does it transform the standard into a "more likely than not" one. One can certainly have a well-founded fear of an event happening when there is less than a 50% chance of the occurrence taking place.

*Cardoza-Fonseca*, 480 U.S. at 431. Accordingly, one cannot conclude that "because an applicant only has a 10% chance of being shot, tortured, or otherwise persecuted, [] he or she has no 'well-founded fear' of the event happening." *Id*. at 440.

The bottom line is this: When the record as a whole lacks substantial evidence supporting the IJ's decision, this panel may overturn the BIA if the applicant's evidence is sufficient to compel the conclusion that there is a reasonable possibility he or she will be persecuted. In the instant case, the record lacks substantial evidence because (a) the Government produced *no* evidence rebutting Eta-Ndu's case and (b) the IJ and the BIA denied asylum based solely on their speculations about a single portion of Eta-Ndu's corroborating evidence. All other evidence in the record as a whole compels the conclusion that Eta-Ndu has more than a reasonable possibility of being persecuted upon his return to Cameroon. Accordingly, I dissent.

## II.    Future Persecution

The IJ and BIA were not justified in rejecting Eta-Ndu's fear of future persecution in Cameroon because a reasonable factfinder looking at the record as a

-17-

whole "would have to conclude that the requisite fear of persecution existed." *Elias-Zacarias*, 502 U.S. at 481. Contrary to the majority's assertions, the IJ and the BIA did not give "specific, cogent reasons" for rejecting Eta-Ndu's explanations. Majority opinion at 12. The IJ and BIA found that Eta-Ndu's testimony was credible, yet they rejected his asylum claim based solely on speculation about two so-called "counterfeit" documents. The record shows clearly that the supposed inconsistencies afflicting the two documents were subsequently and reasonably explained by Eta-Ndu. Unfortunately, these explanations were never acknowledged. Thus, denial of asylum was not supported by "reasonable, substantial and probative evidence on the record considered as a whole." *Id.*

## A. Expert Testimony

Expert witness Dr. Milton Krieger delivered highly probative testimony that not only provided objective corroboration for Eta-Ndu's fear of future persecution, but also provided objective corroboration of the two SDF letters confirming Eta-Ndu's SDF membership. The IJ, the BIA, and the majority all failed to come to terms with Dr. Krieger's poignant testimony.

For instance, contrary to the majority's flawed review of the record, *supra* majority opinion at 10 n.3, Dr. Krieger did testify to the direct risk of persecution faced by Eta-Ndu. He stated:

> [O]ne of the most striking features in Mr. Eta-Ndu's and his wife's testimony here is what happened in his home village of Manfe in 1994. This is a particularly dangerous area for the opposition because the local political leader['s] . . . role as political boss [is] to hold the regime's authority there, to hold the line against any defections from the region into the opposition.
>
> Now, I think there is very striking testimony in . . . Eta-Ndu's affidavit . . . [which] recounts what happened to the Eta-Ndu family in early 1994

-18-

when . . . it had been known for a while that the family was an SDF family . . . . [T]here is [a] sequence in early 1990 when the local representative of the regime . . . and this is basically the internal security ministry in Cameroon, began to visit the family to warn him father [*sic*] and other family members that the family's opposition was not going unnoticed. This culminates in March . . . of 1994 with the shooting death of . . . Mr. Eta-Ndu's uncle and the subsequent flight of the father and two other brothers to Nigeria.

Now, this is the kind of local intimidation and direct repression that I think speaks to the dangers that rank and file SDF opposition . . . have in these little back country episodes that come to light infrequently, but really do represent what has happened to the rank and file Cameroonians . . . . I think that's a very – a very striking run of events leading to the death of the uncle whose body was found with personal possessions and everything else intact but party documentation removed. . . . And I believe this [is] a very strong – ***a very strong indicator of what this person and his family face should they return to Cameroon***.

A.R. at 212-14 (emphasis added).

Later, the IJ asked Dr. Krieger to quantify the *likelihood* that Eta-Ndu would be subject to arrest or torture if deported to Cameroon, even though Eta-Ndu did not need to demonstrate a likelihood of persecution under the law. Krieger responded:

Well . . . he has a fairly high profile. He's known for having gone abroad [to the U.S. for school], he's known from his family as a SDF work[er] in Manfe, and I believe that there is a ***substantial high risk*** that going home would be a really – really a challenge to his livelihood and his safety. . . . Given his uncle's fate I think that there is a ***very – very substantial risk that – that he would be persecuted directly***. It's very hard to say this, it's an arbitrary government and in quantifying the risk would be – that's more than I would want to – to do. But it's a ***high – high – very high risk*** that this man is known well enough and of interest to the authorities and in such a way as to ***endanger him should he and his family []return***.

-19-

A.R. at 219-20 (emphasis added).

Dr. Krieger added that it is probably safe to be a mere card-carrying SDF member (*not* an activist) in Cameroon today. However, he testified that "since Mr. Eta-Ndu has been out of the country I'm not sure it's so true [in] his case." A.R. at 229. Krieger explained:

> [A]t the most recent hearing on April 6, 1998, the Court raised a question about whether the danger to the Applicant and his family has passed since the SDF is now a legal political party. However, the legalization of the SDF is in large part a cosmetic change, made in response to Cameroon's concerns for world opinion. In reality . . . the CPDM [the ruling party] still abuses its power to keep the upper hand and to minimize the threat posed by the SDF. As I testified during the first hearing in this case, the abuses of power (threats, imprisonment, intimidation, torture, and illegal detention) are <u>initiated and carried out at the local level</u>, beyond virtually all scrutiny, by CPDM officials anxious to retain their fiefdoms and curry favor among those higher up in the organization. The legalization of the SDF has done nothing to constrain the acts of these local CPDM officials. ***The Applicant in this case continues to be a target of his former boss***, Mr. Ayuk-Takem, for the Applicant's previous "political affronts" – i.e., having the "audacity" to serve as an SDF organizer . . . . A law on the books legalizing the SDF does not institutionalize democracy, depersonalize politics, or eliminate Mr. Ayuk-Takem's ability to make good on his threats.

Affidavit of Dr. Krieger (located in Petitioners' Appendix at 307 (underline in the original; other emphasis added)); A.R. at 246-47 (Krieger's testimony regarding same); *see also* A.R. at 487-88 (statement by court accepting Krieger's affidavit into evidence).

When the Government asked Dr. Krieger whether he attributed the death of Eta-Ndu's uncle to anyone in particular, the following exchange occurred:

[Answer:] I think my tenure on the ground of Cameroon and the sources of information I rely on for my book and other writings that I've done make it to my mind unmistakably clear that it was the division officer in Manfe division of southwest province whose authority and responsibility [it] would be to supervise politics . . . . It would be [the] particular responsibility of the division officer in Manfe to keep track of political opposition locally and to execute the government's will in these cases. . . .

[Question by Government]: So it's basically just your own opinion that who you think may have killed him?

[Answer:] *I'm almost certain. I think well informed as I am I'm certain that whoever killed him, the direction of the division officer was behind the act*.

[Question:] Okay. But you don't know that for sure, do you?

[Answer:] No, but it's not the first thing that gets to a court in Cameroon.

A.R. at 224 (emphasis added).

Contrary to statements made in the IJ's and majority's opinions that reports of the uncle's death "would be expected . . . [to] be reported in the local press," *see* Oral Decision at 26, majority opinion at 5, 10, Dr. Krieger testified specifically about the nature of the uncle's murder, explaining it was representative of "back country episodes that come to light infrequently . . . ." A.R. at 214. Krieger could identify only a single newspaper, called *The Herald,* that would likely report the death of a politically motivated murder, but he stated that *The Herald* would only publish such information if it involved a known activist and if "that information . . . is public." A.R. at 242; *cf.* majority opinion, *supra*, at 10, (suggesting Dr. Krieger testified the uncle's death would have been reported in the press, which is not what Dr. Krieger actually said). No evidence established whether Eta-Ndu's uncle was widely

regarded as an activist by the Cameroonian public, or that his death was public information. Krieger also testified that the press is sometimes subject to repression regarding news of political opponents both pre- and post-publication. *See* A.R. at 247. He noted that Manfe, the region in which the uncle was murdered, is "quite remote," A.R. at 243, making reporting from that area even more difficult.

Although an IJ may request corroborative materials "if they are 'easily available,'" documentation from overseas "is almost never easily available." *Kaur v. Ashcroft*, 379 F.3d 876, 890 (9th Cir. 2004) (citation omitted). Even if a 1994 *Herald* article documenting the uncle's death did exist, Eta-Ndu testified that he could not obtain this paper in the United States. *See* A.R. at 378. No one testified that United States libraries, Cameroonian libraries, the Cameroon government, or any entity whatsoever stockpiles old copies of this obscure periodical. It remains baffling to me why the IJ expected Eta-Ndu to obtain such a source. No evidence supported the IJ's unreasonable expectation that Eta-Ndu had a means to obtain a decade-old article. The credibility of Eta-Ndu's case should not have been doubted on this basis.

Contrary to statements made in the IJ's and majority's opinions that Dr. Krieger told them confirmation of SDF membership should be "easily" available, Dr. Krieger actually testified that although the SDF generally kept good records at the precinct level, evidence of Eta-Ndu's particular membership might not be available:

> It might depend on which were the precinct and which town. In Bamenda which is the heartland of SDF activity I think that information is – is there and if the SDF wish to provide it could do so. *I couldn't speak for Manfe which I presume might be Mr. Eta-Ndu's home base*. This would not be part of a public record . . . .

A.R. at 225 (emphasis added); *cf.* Oral Decision at 27; *cf.* majority opinion, *supra*, at 3, 10 (once again mischaracterizing the record by attributing to Dr. Krieger the statement that Eta-Ndu "would be able to verify membership" in the SDF or could "easily" obtain verification.). There was no testimony in this case establishing that

Eta-Ndu, local grassroots activist, could "easily" obtain verification documents from the SDF.

In sum, Dr. Krieger's expert testimony established that Eta-Ndu hails from a "particularly dangerous" region for SDF opposition members; that the uncle's death was almost certainly orchestrated by the existing government; that the uncle's death was a "very strong indicator of what [Eta-Ndu] and his family face should they return to Cameroon"; that back country episodes of political persecution, such as the uncle's murder, "come to light infrequently" despite the fact that *The Herald* publishes such events; that there is a "very high risk" that Eta-Ndu is well-known to the government due to his international schooling, his family's political activism, and his own political activism; that Eta-Ndu is still a target for persecution by his former boss because of Eta-Ndu's political beliefs; and that Eta-Ndu faces a "very substantial risk that he would be persecuted directly." Dr. Krieger also testified that one might have difficulty obtaining evidence of Eta-Ndu's SDF membership from Manfe – Eta-Ndu's "home base" – because it was a very remote area. In the face of all this, the majority insists Krieger did not corroborate Eta-Ndu's claims. *See* majority opinion, *supra*, at 10 n.3. This is an irrational conclusion.

The substance of Dr. Krieger's testimony was uncontested and his expertise was likewise unchallenged. His testimony indicated that Eta-Ndu faced a reasonable possibility of future persecution; indeed, it actually showed that Eta-Ndu faced a *very high likelihood* of being singled out for persecution on account of his political beliefs should he be deported to Cameroon.

Any reasonable factfinder listening to Dr. Krieger's testimony would have to conclude that the requisite fear of persecution existed in this case. His testimony clearly qualifies as credible, direct, and specific evidence of a reasonable fear of persecution. In comparison, the Government produced no evidence whatsoever to rebut the overwhelming proof presented by Eta-Ndu. The BIA summarily dismissed

Eta-Ndu's proof relying only on speculation of the IJ concerning the corroborating evidence. The majority commits the same error.

### B. Additional Corroborating Evidence

### 1. The Two Letters from SDF Officials

The key pieces of evidence establishing Eta-Ndu's political affiliation with the SDF were the two typed letters from SDF officials, Dr. Christopher and Professor Mbu-Agbor. Dr. Christopher's follow-up letter explained why his initial letter lacked letterhead or other official markings:[6]

> [My] letter was typed by a secretary at the Bamenda SDF provincial Office. We do not have a typewriter in Bambui, neither do we have any building that serves as an Office. We hold party meeting [*sic*] in the homes of members who have enough space to accommodate all the members. Members rotate in playing the role of hosts for party meetings.

---

[6]Incidentally, Dr. Christopher's follow-up letter was sent directly from Cameroon to Eta-Ndu's counsel in Minneapolis, *see* A.R. at 517, in order to preempt the IJ's suspicions.

At one point, the IJ stated he had seen SDF letters bearing official letterhead in other asylum cases. *See* Oral Decision at 27; *see also* majority opinion, *supra*, at 4 (apparently finding the IJ's statement to be worthy of significance). This remark does not in any way disprove Dr. Christopher's explanation that SDF officials in rural areas lacked letterhead, offices, and unsurprisingly, typewriters. This gratuitous statement was unsupported by evidence and did not indicate whether the IJ's other cases involved asylum applicants from equally remote regions of Cameroon. At any rate, the record evidence overwhelmingly contradicts such a statement, and it is highly inappropriate to give weight to such statements.

. . . . Our local correspondence is done by hand written memos. We generally have official mail destined for other regions typed in Typing Schools in Bamenda Town or in our Provincial Office. . . .

You also expected that I write the affidavit in an SDF letterhead. . . . [T]here are no SDF letterheads beyond the level of a Division. Letterheads and official stamps are available at the party head quaters [*sic*] and Provincial office. As a matter of fact, some Divisions do not have letterheads. The party is operating on a shoestring budget. . . .

A.R. at 516. This is more than sufficient explanation as to why the SDF letters lacked "official" markings in this case.

There was also a sound explanation as to why the two SDF letters appeared to be mailed from the same place, despite the geographic distance between the authors. Prior testimony by Eta-Ndu explained it is common for Cameroonians to ask a passerby traveling from Bamenda to Yaounde to carry international mail on their behalf, and to mail it upon reaching the post office in Yaounde. *See* A.R. at 472-74. Eta-Ndu also stated that hand-carrying correspondence is a popular custom; because official mail is so slow, it is actually quicker to mail international correspondence from Yaounde, which is close to the airport. *Id.*

Dr. Krieger's affidavit corroborated and bolstered Eta-Ndu's explanation about the custom of hand-carrying letters to Yaounde for mailing, and explained why Dr. Christopher's and Professor Mbu-Agbor's letters were postmarked on the same day.

. . . Mail service in Cameroon is haphazard, and the preferred way to send mail overseas is to get a letter to Yaounde or Douala, where the two international airports are located, for mailing. Thus, any mail considered urgent would be *carried in person or by courier* from Mamfe, Bamenda, or any place "up-country" to those cities . . . .

. . . In addition, I have heard that mail in Cameroon, even [in] Yaounde, *is not necessarily postmarked on the day that it is mailed.* Sometimes

the post office will hold mail for several days and will postmark all mail in a batch on the day it leaves the post office, regardless of what day it was received . . . .

Affidavit of Dr. Krieger (located in Petitioners' Appendix at 307) (emphasis added). Given the remote, rural, and impoverished nature of up-country Cameroon, it makes sense that two letters from two SDF officials located in remote regions would be hand-written, carried to and typed at the same central office on the same typewriter, and then held in batches at the same major post office to be postmarked on the same day.

The majority found this explanation unsatisfactory, even though the Government presented no evidence to the contrary, but solely because

Eta-Ndu failed to obtain a letter from the second author, or from the typing school, as the BIA noted. Eta-Ndu also failed to explain the practice of the school returning the documents back to the remote branches for the author's signature. This additional step would require another hand-carrying of the letters to and from two remote regions of Cameroon, with coincidental arrival back to the same postal office for postmark on the same day.

Majority opinion, *supra*, at 11. This passage is an example of how the majority has failed to consider fairly the record as a whole.

First, an IJ's subjective believe that documents are unreliable or forged is an insufficient basis to support an adverse credibility finding. *See Shah v. INS*, 220 F.3d 1062, 1071 (9th Cir. 2000). Neither the Government nor the IJ asked Eta-Ndu to explain whether the school had a practice of returning the documents back to the remote branches for the author's signature. There is not a single question in this record about how the signatures were obtained. Although it is true that the IJ cited his concern over the signatures as a major reason that he doubted the authenticity of the letters, this was speculation *never articulated before the oral decision*. Eta-Ndu

-26-

never received any notice that the IJ's concern was premised upon this issue, and yet the IJ, the BIA, and the majority make this into a zero-sum issue. If this issue was so important, the IJ should have asked Eta-Ndu how the signatures were obtained or whether someone was empowered to sign for the authors, rather than relying on his own speculation.

In short, the "IJ's proffered reasons for disbelieving" Eta-Ndu were based on mere "personal conjecture about the manner in which" correspondence is written, signed, and circulated in the Cameroonian SDF. *Kaur*, 379 F.3d at 887. "Speculation and conjecture cannot form the basis of an adverse credibility finding, which must instead be based on substantial evidence." *Id.* (citation omitted); *see also Gui v. INS*, 280 F.3d 1217, 1225 (9th Cir. 2002). Since the majority has nothing more to go on than the IJ's subjective belief that the documents were unreliable, the adverse credibility determination as to those documents was error.

Moreover, it is an abuse of discretion to make an adverse credibility finding when the IJ "fail[ed] to address a petitioner's explanation for a discrepancy or inconsistency." *Kaur*, 379 F.3d at 887. As explained above, letters are frequently *not* postmarked on the day they arrive at the post office. The postmaster accumulates mail and postmarks it in batches on the day it leaves the post office, regardless of the day mail arrived at the post office. Hence, there is nothing "coincidental" or suspicious about the fact that the two SDF letters bear the same postmark date. The IJ, BIA, and majority relentlessly refuse to acknowledge record evidence about mailing customs in Cameroon, which were corroborated by Dr. Krieger.

In light of the record, the majority has no basis for doubting evidentiary integrity on the basis of issues Eta-Ndu never had the opportunity to explain. Nor is there any basis for the majority's continued suspicion of the SDF letters on account of their "coincidental arrival back to the same postal office for postmark on the same day," majority opinion, *supra*, at 11, since Eta-Ndu explained these discrepancies.

-27-

Cameroonian society does not operate in a matter identical to the United States, and this point should be obvious to the IJ, the BIA, and the majority. I cannot affirm a decision based on such irrational grounds.

## 2. Testimonial and Documentary Evidence

Testimony by Jacob Eta-Ndu, *see* A.R. at 192, 291; Catherine Eta-Ndu (Jacob's wife), *see id.* at 401; and Comfort Ateh (a colleague), *see id.* at 251, 255, were all consistent with Dr. Krieger's testimony. The witnesses' accounts of political persecution of SDF members were also consistent with the various country reports on Cameroon submitted as part of this record. *See* Trial Exhibits 3, 7, 10 (located in Petitioners' Appendix at 114, 144, 281, respectively).

Eta-Ndu also submitted multiple pieces of documentary evidence in support of his asylum application, to which the majority opinion gives cursory mention. *See supra* majority opinion at 4. Three pieces of evidence warrant discussion.

First, Eta-Ndu submitted a letter from Bechem-Eyong-Eneke, a magistrate with the Legal Department for the Southwest Province in Buea, Cameroon, who is also Eta-Ndu's cousin. *See* A.R. at 730. This letter was attached to Eta-Ndu's original application for asylum. It documented Eta-Ndu's father's and uncle's participation in the SDF, the murder of Eta-Ndu's uncle, the flight of Eta-Ndu's father from Cameroon, and the subsequent placement of Eta-Ndu on the "black list" of the CPDM because of his affiliation with the SDF party.

Counsel for the Government suggested that the letter from Magistrate Bechem was suspicious. In response, Dr. Krieger testified that such suspicions "hadn't occurred to me, I know enough about the local politics in Cameroon to not truly have – be suspicious of what was reported about the families [*sic*] experience and it's [*sic*]

-28-

flight to Nigeria. . . . [¶] I didn't find any set of suspicion to bring a case against that testimony." A.R. at 229-30; *see also id.* at 248.

Eta-Ndu's claims about his uncle's death were further corroborated by the fact that, *after* filing his application and testifying about his uncle's death, Eta-Ndu obtained a copy of the police report documenting his uncle's death and a letter from his father discussing the uncle's death. *See* A.R. at 576, 578, 589. The police report indicated that the uncle's body was found on March 11, 1994, at about 6:00 A.M., "close to the Mamfe motor park," and that the uncle died as a result of three gun shot wounds. *Id.* at 578. This information is consistent with the description of the death provided earlier by Eta-Ndu's testimony and Magistrate Bechem's letter.

The father's letter, mentioned above, was written on March 5, 1998. *Id.* at 589. It recounts events that occurred after Eta-Ndu's father switched his allegiance from the ruling party to the SDF, and describes the father's activism on behalf of the SDF, government agents' attempts to question and harass the father about his son, the death of the uncle, and the father's subsequent flight from Cameroon to Nigeria. This information is consistent with Magistrate Bechem's letter and the police report. These three pieces of documentary evidence, considered in conjunction with testimony (especially that of Dr. Krieger), corroborated Eta-Ndu's claims of future persecution on account of political opinion.

## III. Conclusion

A denial of asylum is not supported by substantial evidence in this case. The majority's denial of asylum is inexplicable. No reasonable factfinder could fail to find that Eta-Ndu faces a reasonable possibility of persecution in Cameroon, *unless* that factfinder persisted in an irrational refusal to acknowledge the testimony of Dr. Krieger and the basic socio-economic and cultural differences between the United States and Cameroon. Dr. Krieger's testimony was particularly compelling, and

-29-

neither the Government nor the IJ had any basis to doubt his expertise or impeach his testimony. Indeed, there is a complete absence of any explanation as to why the IJ, BIA, and majority failed to acknowledge the thrust of Krieger's testimony, which was highly probative.

The majority is completely unjustified in concluding that "the IJ and the BIA correctly addressed Eta-Ndu's corroboration and explanations." Majority opinion, *supra*, at 12. The IJ ignored testimony and explanations, entertained unfair evidentiary demands, and based his ultimate decision on an unsupported speculation. There is no substantial evidence supporting the IJ's and the BIA's decision – only speculation and doubt premised upon ignorance.

Eta-Ndu's application for asylum should have been granted. To hold otherwise misquotes the record, fails to examine the record as a whole, and misapplies the governing legal standard. Under the majority's approach, this court provides a rubber stamp to the BIA's oversight and constitutes a gross miscarriage of justice.

I dissent.