# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 05-1493

_____

| | |
|---|---|
| Ardian Celaj; Mirela Celaj; Armela Celaj, | * |
| | * |
| | * |
| Petitioners, | * Petition for Review |
| | * of an Order of the Board of |
| v. | * Immigration Appeals. |
| | * |
| Alberto Gonzales, Attorney General, | * |
| | * |
| Respondent. | * |

_____

Submitted: September 29, 2006
Filed: November 27, 2006

_____

Before WOLLMAN, BOWMAN, and BENTON, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

Ardian Celaj,[1] Mirela Celaj, and their daughter, Armela, petition for review of an order of the Board of Immigration Appeals (BIA) that affirmed an Immigration

_____

[1]Because Ardian Celaj is the principal applicant and most of the facts in this case concern Ardian's claims of persecution, all references to "Celaj" pertain to him.

Judge's (IJ) denial of their application for asylum, withholding of removal, and protection under the Convention Against Torture. We deny the petition.

## I.

Celaj, a citizen of Albania, entered the United States on or about October 10, 2000, using a false German passport. He was served with a notice to appear in late August 2001. He admitted that he was removable and, as set forth above, applied for asylum, withholding of removal, and protection pursuant to the Convention Against Torture.

Celaj's application is based on his claim that he was persecuted by individuals affiliated with Albania's ruling Socialist Party because of his support for the opposition Democratic Party. According to Celaj, he was beaten, threatened with death, and subjected to arbitrary arrests.

Celaj's testimony at the removal hearing was as follows. Celaj was a "simple member" of the Democratic Party. Although he did not recruit party members or organize meetings, he did speak up for the Democratic Party when he was among friends and family and he engaged in some election-related party activities. During the June 1997 elections, Celaj was a poll watcher for the Democratic Party. When he drew attention to the fact that someone had voted twice, he was accosted and beaten by members of the rival Socialist Party. A few months later, while he was walking home with his wife, Celaj was stopped by three men, one of whom Celaj knew to be working for the secret police. These men threatened to kill him and take away his family if he persisted in his Democratic Party membership. They also told him to stay quiet about the voting irregularities he had seen in the election.

In 1998, Celaj was arrested several times, but was never accused of a crime. One arrest occurred on September 14, 1998, after demonstrations following the death

of Democratic Party leader Azem Hajdari. Celaj was held for a few days and was beaten. He was also arrested in September 1999 and assaulted in front of his home in July 2000.

Elections were held in October 2000. For two days in September of that year, Celaj distributed Democratic Party political materials in one or two nearby villages. On the evening of September 12, 2000, when Celaj and a friend were returning home from these activities, they were stopped by a group of men who fired their guns in the air, ordered them out of the car, and commenced beating them. Their assailants spoke of killing them and told them that "there is no Democratic Party." Celaj and his friend were able to escape and retreat into the mountains. Celaj stated that his attackers were affiliated with the Socialist Party. After the Socialist Party prevailed at the polls in October 2000, Celaj left Albania. He would have remained in Albania if the Democratic Party had won.

## II.

Both the IJ and the BIA denied Celaj's application, finding that Celaj failed to meet his burden of proof. We will uphold the BIA's determination unless the evidence is "so compelling that no reasonable factfinder could fail to find the requisite fear of persecution." Nyama v. Ashcroft, 357 F.3d 812, 816 (8th Cir. 2004) (quoting INS v. Elias-Zacarias, 502 U.S. 478, 483-84 (1992)); see also 8 U.S.C. § 1252(b)(4)(B). An IJ's adverse credibility determinations will be upheld if they are supported by specific, cogent reasons for disbelief. Eta-Ndu v. Gonzales, 411 F.3d 977, 982 (8th Cir. 2005) (citing Perinpanthan v. Ashcroft, 310 F.3d 594, 597 (8th Cir. 2002)). "While minor inconsistencies and omissions will not support an adverse credibility determination, inconsistencies or omissions that relate to the basis of persecution are not minor but are at the heart of the asylum claim." Jalloh v. Gonzales, 423 F.3d 894, 898 (8th Cir. 2005) (quoting Kondakova v. Ashcroft, 383 F.3d 792, 796 (8th Cir. 2004)).

In his discretion, the Attorney General may grant asylum to a refugee. 8 U.S.C. § 1158(b). A refugee is a person who is unwilling or unable to return to his or her home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). The applicant's fear of persecution must be both subjectively genuine and objectively reasonable. Eta-Ndu, 411 F.3d at 983. If an applicant can show past persecution, a rebuttable presumption of future persecution arises. Id. In assessing an applicant's claims of persecution, an IJ may reasonably rely on assessments made in State Department reports. See Cao v. Gonzales, 442 F.3d 657, 661 (8th Cir. 2006) (holding that discrepancies between the applicant's testimony and State Department reports supported an adverse credibility determination).

The IJ denied Celaj's application for asylum because he did not credit Celaj's claims of persecution. The IJ's conclusion was based on State Department reports on Albania, evidence supplied by Celaj indicating that Shkoder, the city from which Celaj hails, is a stronghold of the Democratic Party, and the fact that several pieces of Celaj's corroborating evidence either contradict Celaj's testimony or are unreliable. We conclude that the IJ's determination was reasonable and that his credibility assessment was based on specific and cogent reasons.

First, the IJ reasonably concluded that a 2001 State Department report undermines the plausibility of Celaj's claim that he had been targeted by the dominant Socialist Party because of his Democratic Party membership. The report states, *inter alia*, that international monitors concluded that the October 2000 elections were generally free and fair with few incidents of violence, that "[a]ll political parties have been active in most of the country without a pattern of mistreatment," and that there is no tradition of "retribution against political leaders and few instances thereof." A.R. 247. The report also states that "[t]here is virtually no evidence that individuals are targeted for mistreatment on political grounds." A.R. 246. Accordingly, the IJ

reasonably concluded that this 2001 State Department report tends to discredit Celaj's claim of political persecution.

Celaj argues that, in reaching this conclusion, the IJ ignored remarks in Human Rights Watch and other State Department reports indicating that politically motivated persecution does occur in Albania. Although we have remanded immigration cases for reconsideration where the IJ has neglected to analyze a significant piece of record evidence, see, e.g., Zheng v. Gonzalez, 415 F.3d 955, 963 (8th Cir. 2005), the statements cited by Celaj on appeal do not materially detract from the conclusions in the 2001 State Department report upon which the IJ relied. Many of the statements Celaj cites, for example, describe allegations of political persecution rather than confirmed reports. Moreover, other reports in the record corroborate the conclusion that politically motivated persecution is uncommon. Having examined the record, we conclude that the IJ justifiably relied on the 2001 State Department report.

Documents describing Shkoder, Celaj's home city, as a "stronghold" of the Democratic Party cast further doubt on Celaj's claim that he had been subject to threats, beatings, and arbitrary arrests due to his party membership. One news article outlines the tension between the socialist central government in Tirana and the local government in Shkoder, which is sympathetic to the Democratic Party. A.R. 384-85. Another report describes Shkoder as "a stronghold of former President Sali Berisha," a leader of the Democratic Party. A.R. 387. The IJ properly concluded that these reports tend to belie Celaj's claim that he was subject to persecution in Shkoder.

The IJ also concluded that some of the documents provided by Celaj were either unreliable or contradicted his testimony. The first of these document is an article from a Shkoder newspaper. This article, written nearly two years after Celaj left Albania, is about Celaj's political activities and his persecution by the socialists. The article

essentially portrays Celaj as a significant member of the Democratic Party[2] — a description out of proportion to Celaj's own testimony that he was merely a "simple member" — and concludes by opining that Celaj "is totally obligated to stay away from his country, because being here in Albania is unsafe for him." A.R. 331. Because the article claims for Celaj an importance beyond that which Celaj claims for himself and because there was evidence that it is possible to pay Albanian newspapers to fabricate news stories, the IJ was warranted in concluding that this article is exaggerated and unreliable.

Similarly, the IJ found that the affidavit from Celaj's friend, Fatmir Ulikaj, was unreliable and contradicted Celaj's testimony. Ulikaj's affidavit states that Ulikaj tended to the injured Celaj following the September 12, 2000, attack. According to the affidavit, Celaj and a friend had been tortured "for many hours" by members of the National Information Service (*i.e.* the secret police). A.R. 311. The IJ reasonably found that this account conflicts with Celaj's testimony that he was stopped by left-wing extremists affiliated with the socialists and that he was taken out of his car and beaten until he was able to escape.

Likewise, the IJ concluded that a letter from Astrit Bushati, a Democratic Party official, and a letter from an anti-communist organization also undermined Celaj's account of the September 12 attack. Although Celaj claimed that his assailants were affiliated with the socialist party, Bushati's letter, which is based on what Celaj told him after the incident, states that Celaj's attackers were "unidentified persons." A.R. 304. The letter from the anti-communist organization mentions a September arrest, but does not say anything about the attack that occurred days later. The IJ reasonably determined that the discrepancies between these pieces of evidence and Celaj's

---

[2]The article states that Celaj was "photographed and filmed in the front of the protests [that followed the death of a Democratic Party leader]" and that Celaj's name was in "the lists of the most potential opponents of the Tirana's government." A.R. 331.

testimony tended to discredit Celaj's statements regarding the attack.[3] Collectively, the inconsistencies in Celaj's corroborative evidence support the IJ's determination that Celaj's claim of persecution is not credible.

Celaj claims, however, that because his testimony alone should suffice to support a finding of past persecution, any infirmities in his corroborative evidence are of little moment. This argument fails for two reasons. First, given the evidence in the record pertaining to Albania and Shkoder, Celaj's claim that a "simple member" of the Democratic Party would be singled out for persecution in the Democratic Party stronghold of Shkoder lacks plausibility. Accordingly, Celaj is incorrect that his uncorroborated testimony should suffice in this case. Second, these documents do not merely fail to corroborate Celaj's claim, they actively undermine it. They tell a different story, thus casting some additional doubt on the accuracy of Celaj's already implausible testimony.

Celaj also argues that because the challenged documents were written by others and Celaj had no control over their contents, any infirmities in the documents should not undermine his claim. This argument is unavailing. An applicant may not submit documents to the immigration court and then disassociate himself from them in the wake of an adverse ruling. In addition, Celaj contends that the IJ neglected to consider plausible explanations for the discrepancies. After a review of the record, and remaining mindful of our deferential standard of review, we cannot conclude that the IJ erred in identifying and taking into account discrepancies between Celaj's testimony and the documents he submitted.

---

[3]The IJ stated that he did not believe that Celaj knew who his attackers were or why they assaulted him. Although the IJ does not speculate about who else might have been behind the attack, the 2001 State Department report cited by the IJ notes that "[as compared to political persecution,] Albanians have more basis for concern over crime and unpredictable armed bandits and the widespread distribution of weapons purloined from the authorities." A.R. 246.

For the foregoing reasons, we conclude that the IJ's determination that Celaj failed to demonstrate eligibility for asylum must be affirmed.  Moreover, because Celaj has not met the lower standard for asylum, he also fails to meet the higher standard for withholding of removal.  Cao, 442 F.3d at 661.  Finally, although the denial of these claims does not automatically preclude protection under the Convention Against Torture, the IJ's adverse credibility findings in this case are fatal to Celaj's Convention Against Torture claim as well.  Id.

The petition for relief is denied.

_____