# United States Court of Appeals
## For the Eighth Circuit
_____

No. 18-1135
_____

Fallou N'Diaye

*Petitioner*

v.

William P. Barr, Attorney General of the United States[1]

*Respondent*
_____

Petition for Review of an Order of the
Board of Immigration Appeals
_____

Submitted: January 15, 2019
Filed: July 24, 2019
_____

Before BENTON, MELLOY, and KELLY, Circuit Judges.
_____

MELLOY, Circuit Judge.

In 2005, Petitioner Fallou N'Diaye was placed in removal proceedings for overstaying his visa. He applied for asylum, withholding of removal, and protection

_____

[1]William P. Barr has been appointed to serve as Attorney General of the United States, and is substituted as respondent pursuant to Federal Rule of Appellate Procedure 43(c).

under the Convention Against Torture ("CAT"). An immigration judge denied his application, finding that he had not met his burden of proof on the merits and ordering him removed. The BIA affirmed. Thereafter, N'Diaye filed a motion to reopen with the BIA because he had married a United States citizen after the immigration judge issued the removal order. The BIA granted the motion, and N'Diaye was placed in another round of removal proceedings.

In the second round of removal proceedings, a second immigration judge ordered N'Diaye removed. The second immigration judge concluded that N'Diaye was ineligible to adjust his status because he had previously provided material support to a terrorist organization. The BIA ultimately affirmed on the same grounds. N'Diaye filed a petition for review of the BIA's decision with this Court. We deny the petition.

## I. Background

### A. The First Round of Proceedings

N'Diaye is originally from Tindody, Senegal. He was legally admitted to the United States in September 2003 as a non-immigrant visitor with authorization to remain in the country for no more than six months. He overstayed his visa. In 2005, he was placed in removal proceedings.

N'Diaye applied for asylum, withholding of removal, and CAT protection. In October 2008, the immigration judge held a hearing on his application. Relevant to this appeal, N'Diaye said that he had been raised in Senegal for most of his childhood years. His mother was dead, but his father was alive. They had both been members of the Movement of Democratic Forces of Casamance ("MFDC"), serving as "representatives of the MFDC in the town where they used to live." N'Diaye explained that "[e]verything [a person] needed to know about the movement MFDC"

could be learned from his parents, and "if [the person] wanted to become a member of the MFDC, they were the contacts."

N'Diaye testified that he joined the MFDC around September 1998. He "belong[ed] to . . . a particular section of the MFDC," the goal of which was "to recruit new members." According to N'Diaye, the goal of the MFDC when he joined was to achieve "independence from Senegal" for the Casamance region. He explained how the MFDC had "started . . . in the political arena, trying to get independent." However, because "the president didn't keep up with his promise," members of the MFDC "started using force" sometime in the 1980s.

N'Diaye explained that he never advocated the use of force against the government, nor did he ever take any action to harm another person in furtherance of the MFDC's goals. However, on cross-examination, he explained that when he joined the MFDC, he was aware that it was "an armed separatist movement" that fought with the Senegalese government. He claimed that the MFDC only fought soldiers; it did not kill Senegalese civilians. Reports to the contrary, he explained, were fabricated by the Senegalese government to make the MFDC look bad. Nevertheless, N'Diaye knew when he joined the MFDC that its members had weapons and used them against Senegalese soldiers.

N'Diaye did much to support the MFDC. He claimed that he helped recruit approximately 50 people to the MFDC by "tell[ing] them about the . . . movement, help[ing] them finance wise and giv[ing]them the information about the MFDC." He explained that he had been giving money to the MFDC on a monthly basis since he entered the United States in 2003. He also sent clothes and other supplies to leaders of the MFDC. He estimated that he had given approximately $700 or $800 of his own money to the MFDC.

N'Diaye's testimony caused the government to argue at closing that he should be statutorily barred from receiving relief because he had materially supported a terrorist organization. See 8 U.S.C. 1182(a)(3)(B)(iv)(VI) (rendering an alien who has "commit[ted] an act that the actor knows, or reasonably should know, affords material support" to a terrorist organization inadmissible). In the interest of fairness, the immigration judge continued the hearing to allow N'Diaye to respond to the government's newly raised argument. The parties submitted supplemental documentation about the MFDC, and the government submitted a brief arguing in favor of applying the bar. The immigration judge then held a final merits hearing.

At the final hearing, N'Diaye testified about the structure of the MFDC. He explained that the MFDC is comprised of two factions: (1) the armed rebels who fought with the government and (2) the "other wings," led by "Abbe Diamacoune," that negotiated with the government in a peaceful way. N'Diaye later clarified that Abbe was a title that meant priest; Diamacoune's first name was really Augustin. N'Diaye stated that both factions had their own chief and that members of different ethnic backgrounds made up the different factions—the peaceful faction was predominantly composed of people from his and one other background, whereas people from a variety of ethnic groups who spoke different dialects made up the rebel faction. Critically, however, on cross-examination, N'Diaye said that despite having "their own leader[s]," the two factions were "the same organization." N'Diaye further testified that he never possessed or used a weapon while he was a member of the MFDC, nor did he ever have contact with or associate with the rebel faction. The immigration judge heard closing arguments on the matter and permitted the parties to submit further briefing one more time before she rendered her decision.

The immigration judge orally announced her decision to deny N'Diaye's application for relief on September 29, 2009. Regarding asylum, the immigration judge said that N'Diaye failed to offer evidence of extraordinary or changed circumstances to excuse his failure to file an application for asylum within one year

-4-

of his arrival date; therefore, she declined to treat it as an asylum application.  She concluded that the government had met its burden of showing that the material-support bar "may apply."  See 8 C.F.R. § 1240.8(d).  However, she also concluded that N'Diaye met his burden of "proving that the terrorism bar d[id] not apply" because N'Diaye's testimony and documentary evidence established that the MFDC was made up of two factions and N'Diaye only supported the peaceful faction.  She found that N'Diaye's testimony regarding his fear of returning to Senegal was not credible.  She also found that his other evidence was insufficient to establish a credible fear of returning.  She thus determined that N'Diaye was ineligible for withholding of removal and CAT relief.  Both N'Diaye and the government appealed.

The BIA affirmed the immigration judge's decision in April 2012.  The BIA held that there was "no clear error in [the] Immigration Judge's adverse credibility assessment" or her factual findings.  Moreover, the BIA concluded that "the record simply d[id] not contain enough credible evidence for [N'Diaye] to meet his burden of proof for withholding of removal" and CAT protection.  The BIA declined to address the government's argument regarding the material-support bar.

### B.  The Second Round of Proceedings

The BIA reopened N'Diaye's case in September 2012 because he had married a U.S. citizen during the pendency of his appeal to the BIA and his wife had filed an alien-relative visa petition on his behalf.  The BIA concluded N'Diaye had submitted new evidence that "would likely change the result in the case."  The BIA, however, did not address the government's argument regarding the material-support bar.  Instead, the BIA remanded the case to the immigration judge "for further proceedings."

N'Diaye had his case transferred to a second immigration judge in Kansas City, Missouri, and applied to adjust his status.  At a merits hearing before the second

immigration judge, N'Diaye and his wife testified about their marriage, and N'Diaye testified about his involvement with the MFDC. He claimed that when he was a member of the MFDC, he would "attend meetings" and "go door to door with the neighbors, try[ing] to inform them and have them join the movement." His actions were solely limited to recruiting others. He explained that the MFDC "was a non-violent organization" but that "there were other organizations at that time, multiple organizations that were fighting for independence, but in a violent way." He did not know much about those groups because he had "never been [a] member of those groups." He stated that the violent groups were "separate and different from [the] MFDC," with "their own leaders" and "their own agenda."

On cross-examination, the government questioned N'Diaye about his testimony before the first immigration judge. N'Diaye contradicted that earlier testimony, stating that the MFDC was not an armed separatist movement. In a confusing manner he explained that, to his knowledge, the political wing and the more militant wings of the MFDC were "not involved." There were "several groups that would engage in" physical fighting, but his "was a non-violent group." It "would not engage in fight[s]," just "political negotiations." When asked why he had earlier stated that his organization had weapons and fought against government soldiers, N'Diaye suggested that the court-appointed interpreter may not have accurately translated what he said at earlier proceedings. The second immigration judge heard closing arguments and took the matter under advisement.

In October 2014, the second immigration judge issued a written decision. He held that the material-support bar applied and denied N'Diaye's adjustment-of-status application. The second immigration judge explained that the documents both parties submitted established that the MFDC, even the peaceful wing N'Diaye claimed he belonged to, engaged in various acts of violence that qualified it as a terrorist organization under 8 U.S.C. § 1182(a)(3)(B)(vi)(III) ("Tier III"). The second

immigration judge concluded that N'Diaye's provision of "nearly $1,000.00" to the MFDC and his recruitment of "approximately 50 people" for the organization constituted material support. The second immigration judge credited N'Diaye's testimony regarding his membership in, and support of, the MFDC because it had been consistent with the testimony N'Diaye had given to the first immigration judge. However, the second immigration judge found that N'Diaye's "testimony regarding his knowledge of the activities of the MFDC was not credible." (Emphasis omitted). The second immigration judge thus concluded that N'Diaye could not carry his burden of showing "by clear and convincing evidence that he did not know, and should not reasonably have known, that the [MFDC] was a terrorist organization." The second immigration judge ordered N'Diaye removed.

The BIA ultimately affirmed the second immigration judge's decision. The BIA concluded that there was no legal impediment barring the second immigration judge from reexamining the issue of whether the material-support bar applied. The BIA agreed with the second immigration judge's holding that the MFDC is a Tier-III terrorist organization. The BIA explained that "the statutory definition of 'terrorist organization' is broad" and stated that even "a subgroup engaging in terrorist activities renders the whole group a terrorist organization." The BIA also agreed with the second immigration judge's conclusion that N'Diaye did not establish by clear and convincing evidence that he did not know and should not reasonably have known that the MFDC was a terrorist organization. The BIA concluded that the second immigration judge did not clearly err in making his credibility determination. The BIA cited N'Diaye's conflicting testimony and pointed out that "the documentary evidence does not demonstrate that the political wing of the MFDC is separate and distinct from the militant wing." N'Diaye timely petitioned this Court to review and reverse the BIA's decision.

## II. Discussion

### A. Standard of Review and Statutory Background

When reviewing a decision from the BIA, "[w]e review the BIA's legal determinations de novo, but we accord 'substantial deference to the BIA's interpretation of the statutes and regulations it administers.'" Godfrey v. Lynch, 811 F.3d 1013, 1017 (8th Cir. 2016) (quoting Spacek v. Holder, 688 F.3d 536, 538 (8th Cir. 2012)). We overturn the BIA's findings of fact only when "they are unsupported by substantial evidence." Id. A factual finding is unsupported by substantial evidence when we, after reviewing the record as a whole, "determine that it would not be possible for a reasonable fact-finder to adopt the BIA's position." Juarez-Coronado v. Barr, 919 F.3d 1085, 1088 (8th Cir. 2019) (quoting Eusebio v. Ashcroft, 361 F.3d 1088, 1091 (8th Cir. 2004)). Where, as here, the BIA has "adopted the findings or the reasoning of the [immigration judge], we also review the [immigration judge's] decision as part of the final agency action." Godfrey, 811 F.3d at 1017 (quoting Garcia-Gonzalez v. Holder, 737 F.3d 498, 500 (8th Cir. 2013)).

Under the Immigration and Nationality Act ("INA"), a nonimmigrant alien seeking to adjust status must, among other things, be "admissible to the United States for permanent residence." 8 U.S.C. § 1255(a). An alien is inadmissible if he "has engaged in a terrorist activity." Id. § 1182(a)(3)(B)(i)(I). The INA defines the term "engage in terrorist activity" to mean, among other things:

> to commit an act that the actor knows, or reasonably should know, affords material support, including a safe house, transportation, communications, funds, transfer of funds or other material financial benefit, false documentation or identification, weapons (including chemical, biological, or radiological weapons), explosives, or training . . . (dd) to a [Tier-III] terrorist organization . . . unless the actor can demonstrate by clear and convincing evidence that the actor did not

-8-

know, and should not reasonably have known, that the organization was a terrorist organization.

Id. § 1182(a)(3)(B)(iv)(VI). A Tier-III terrorist organization is an organization "that is a group of two or more individuals, whether organized or not, which engages in, or has a subgroup which engages in" terrorist activities. Id. § 1182(a)(3)(B)(vi)(III). A terrorist activity, in turn, is:

> any activity which is unlawful under the laws of the place where it is committed (or which, if it had been committed in the United States, would be unlawful under the laws of the United States or any State) and which involves any of the following:
>
> > (I) The highjacking or sabotage of any conveyance (including an aircraft, vessel, or vehicle).
> >
> > (II) The seizing or detaining, and threatening to kill, injure, or continue to detain, another individual in order to compel a third person (including a governmental organization) to do or abstain from doing any act as an explicit or implicit condition for the release of the individual seized or detained.
> >
> > (III) A violent attack upon an internationally protected person (as defined in section 1116(b)(4) of title 18) or upon the liberty of such a person.
> >
> > (IV) An assassination.
> >
> > (V) The use of any—
> >
> > > (a) biological agent, chemical agent, or nuclear weapon or device, or
> > >
> > > (b) explosive, firearm, or other weapon or dangerous device (other than for mere personal monetary gain),

with intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property.

(VI) A threat, attempt, or conspiracy to do any of the foregoing.

Id. § 1182(a)(3)(B)(iii). In removal proceedings, the burden is on the alien to establish that he is eligible to adjust status. See 8 C.F.R. § 1240.8(d). If the evidence indicates that the alien may have materially supported a terrorist organization, he must also prove by a preponderance of the evidence that the material-support bar to admissibility does not apply. See id.

## B. Analysis

N'Diaye essentially argues that the MFDC he supported was not a terrorist organization. Alternatively, he argues that he did not know and should not reasonably have known the MFDC was a terrorist organization when he supported it. We hold that N'Diaye failed to meet his burden of proof on both issues.

The evidence before the second immigration judge indicated that the material-support bar may have applied. N'Diaye recruited approximately 50 people for the organization and gave it nearly $1,000. Moreover, documentary evidence submitted by both parties indicated that the MFDC was a terrorist organization when N'Diaye supported it. During the relevant periods, the MFDC reportedly killed, wounded, and mutilated citizens, committed assassinations, and engaged in other violence using firearms and "other weapon[s] or dangerous device[s] . . . with intent to endanger . . . the safety of one or more individuals" and to substantially damage property. 8 U.S.C. § 1182(a)(3)(B)(iii)(V)(b). The burden was thus on N'Diaye to prove the material-support bar did not apply.

The BIA correctly concluded that N'Diaye failed to meet his burden of proving that the MFDC did not qualify as a Tier-III terrorist organization at the time he supported it. At all relevant times, the MFDC easily fit within the statutory definition of a Tier-III terrorist organization. It was an organized "group of two or more individuals," and it engaged in terrorist activities. Id. § 1182(a)(3)(B)(vi)(III). Specifically, documents submitted by both parties show that the MFDC: "shelled civilian targets," in some instances to deter people from voting in elections that the MFDC viewed as illegitimate; violently attacked and robbed civilians; killed civilians who were suspected of being government supporters; planted landmines on public roadways; brutalized and raped women; stole property; mutilated and tortured individuals in attempts to gain information about government forces; and assassinated at least one government official.

N'Diaye argues that the second immigration judge and the BIA erred in failing to make a "particularized factual finding" that the militant wing of the MFDC was a "'subgroup' of the MFDC." He argues that case law from the Third and Seventh Circuits treats the BIA's failure to make such a finding as reversible error. See Uddin v. Attorney Gen. United States, 870 F.3d 282, 290 (3d Cir. 2017); Khan v. Holder, 766 F.3d 689, 699–702 (7th Cir. 2014). We need not decide whether to adopt a similar rule. In this case, N'Diaye testified that the group he supported was an "armed separatist" group that used weapons to fight against government forces. Nevertheless, N'Diaye now argues that he belonged to an MFDC that was wholly independent from the violent groups that committed the atrocities listed above. That argument, however, is unsupported by the record. Like the BIA before us, we acknowledge evidence in the record that suggests "the MFDC ha[d] multiple factions that . . . varied across geographic and ideological lines." However, nothing in the record convinces us that N'Diaye recruited members for and gave money to a completely peaceful faction. To the contrary, N'Diaye said he supported an "armed separatist" group. He said that his group was led by Abbe Diamacoune, who the

documentary evidence reveals helped found and lead the more violent Southern Front of the MFDC's militant wing in addition to the organization's political wing. Diamacoune later served as president of the entire MFDC. Given the lack of evidence that N'Diaye supported an entirely peaceful faction of the MFDC, coupled with the substantial evidence to the contrary, we reject N'Diaye's argument that he supported a wholly independent, peaceful MFDC.[2]

The BIA likewise was correct in concluding that N'Diaye failed to meet his burden of proving that he did not know or should not have had reason to know the MFDC was a terrorist organization when he supported it. Substantial evidence supports the BIA's finding that N'Diaye's testimony was not credible as to this issue. Furthermore, N'Diaye failed to put forth any other evidence, let alone the kind that is clear and convincing, to show that he did not know or should not have had reason to know that the MFDC engaged in terrorist activities.

Finally, N'Diaye essentially argues that collateral estoppel and the law-of-the-case doctrine should have prevented the second immigration judge from reconsidering whether N'Diaye materially supported a terrorist organization. We disagree. Collateral estoppel does not apply here because the issue was not previously determined by a valid and final judgment. Rather, it "was determined at an earlier stage of the same action and was reconsidered pursuant to the reopening of the action." Estrada-Rodriguez v. Lynch, 825 F.3d 397, 402 (8th Cir. 2016) (emphasis omitted); see also Arizona v. California, 460 U.S. 605, 619 (1983) ("It is clear that res judicata and collateral estoppel do not apply if a party moves the

---

[2]We acknowledge, as did both immigration judges who heard him, that N'Diaye's testimony suffers from significant credibility issues. However, in at least the instances just cited, N'Diaye's testimony comports with what we have found in the documents. We, therefore, cannot fault the BIA for taking him at his word in these limited circumstances.

rendering court in the same proceeding to correct or modify its judgment."). Nor did the second immigration judge abuse his discretion by reconsidering the issue. See Estrada-Rodriguez, 825 F.3d at 403 (holding that an immigration judge did not abuse discretion by reconsidering an issue on remand); see also In re Patel, 16 I. & N. Dec. 600, 601 (BIA 1978) (holding that unless qualified or limited for a specific purpose, a "remand is effective for the stated purpose and for consideration of any and all matters" that the immigration judge deems appropriate).

## III. Conclusion

For the foregoing reasons, we deny N'Diaye's petition for review.

———————————————